# LEASE AGREEMENT

**THIS LEASE AGREEMENT** ("Lease") is made by and between **BRISTOL PRESERVATION, LLC**, a Tennessee liability company with an office at 1954 West State Street, Bristol, Tennessee 37620 ("Landlord") and **KOVA BRISTOL TENN 1894, LLC**, a Florida limited liability company, with an office at 9130 Galleria Court, Suite 100, Naples, Florida 34109 ("Tenant"), and is effective on the date this Lease is fully executed by Landlord and Tenant and each party has received at least one (1) fully executed counterpart of it ("Effective Date").

**WHEREAS,** Tenant is engaged in the business of golf facility management and operations;

**WHEREAS,** Landlord is the owner of the Leased Premises (as defined below), that includes that certain 18-hole golf course known as "Country Club of Bristol" ("Golf Course"), located thereon;

**WHEREAS,** Landlord desires to lease to Tenant, and Tenant desires to lease from Landlord, the Leased Premises (as defined below).

Landlord and Tenant, each intending to be legally bound, agree as follows:

1.     **LEASED PREMISES; USE OF PREMISES; CONDITION OF PREMISES.**

    (a)    Landlord demises and leases to Tenant, and Tenant leases from Landlord, all that certain property with the buildings and improvements thereon located at 6045 Old Jonesboro Road, Bristol, Tennessee 37620, as more particularly described on **Exhibit A**, attached hereto and made a part hereof, and as more particularly depicted on **Exhibit B**, attached hereto and made a part hereof, including, (i) the 25,240 square foot two-level clubhouse ("Clubhouse"), 3,360 square foot maintenance building, 2,700 square foot maintenance building, and all other buildings, structures and improvements now located or hereafter constructed on the land encompassing the Leased Premises, (ii) the golf practice facility located on the Leased Premises, (iii) the cart fleet and maintenance equipment as more particularly set forth on **Exhibit C**, attached hereto and made a part hereof, (iv) all fixtures and equipment attached to, forming a part of and necessary or desirable for the operation of the Golf Course and Clubhouse and other buildings, structures or improvements (including, without limitation, heating, lighting, plumbing, sanitary system, air-conditioning, refrigeration, kitchen, elevators and similar items, computers, telephones, information technology, and point of sale systems) and such, if applicable, (v) tennis court, (vii) restaurants, bars and banquet, meeting and other public areas, (vii) commercial space, including concessions and shops, (ix) garage and parking space, (x) storage and service areas, (xi) recreational facilities and areas located within the Leased Premises, (xii) public grounds and gardens, (xiii) permanently affixed signage and (xiv) other facilities and appurtenances, all as presently exist on the Leased Premises or are hereafter added thereon, and (xv) any right, title and interest of Landlord in and to any licenses, easements, appurtenances benefiting the Leased Premises, and any rights, powers, privileges and appurtenances in any way pertaining thereto (collectively, the "Leased Premises"). The Leased Premises excludes the real property more particularly described on **Exhibit D** attached hereto and made a part hereof ("Excluded Property"), and all existing contracts or agreements between the prior operator of the Leased Premises and members of the Golf Course. All equipment being leased to Tenant, to the extent such equipment exists and is located at the Leased Premises, is leased "as is" without any representation or warranty by Landlord.

    (b)    Tenant may use and occupy the Leased Premises for (i) the operation and management of a semi-private golf course, (ii) the operation and management of the Clubhouse, including, but not limited to, operation and management of food and beverage services, banquet facilities, professional shops, and fitness and recreational facilities, (iii) such other use that Tenant deems reasonable and necessary and does

not interfere with the foregoing; provided, however, that Tenant shall not operate any fitness center/gym type uses without the prior written consent of Landlord. All materials, goods, and equipment stored, delivered to, or offer for sale on the Premises shall be the property of Tenant, except those owned by Landlord as expressly identified in this Lease. Tenant shall comply with all federal, state, and local laws, rules and regulations, including, but not limited to, those related to tax, environmental, American with Disabilities Act, fire, building, and safety, which may apply to the operation and management of the Leased Premises.

(c)     Landlord warrants and represents that as of the Commencement Date, and subject to further provisions of this Lease regarding work to be completed by either party: (i) Landlord will deliver the Leased Premises to Tenant in an operating condition (not including further work to be completed as provided under this Lease) to be immediately opened for business; (ii) the electrical, plumbing, and heating, cooling and ventilating system ("HVAC") of the Leased Premises are in good working order, (iii) the Golf Course greens are not materially deteriorating in any way and comply with generally accepted industry standards, (iv) Landlord is not aware of any material structural deficiencies or defects of any the foundations or buildings constituting the Leased Premises, (v) there are no zoning, permitting, environmental, or other regulatory matters that prohibit using the Leased Premises for the operation of a landscape business golf club, and (vi) Golf Course irrigation and irrigation pumps are in good working order, (vii) there is no existing mold in the Clubhouse, (ix) the Leased Premises is compliant with the Americans with Disabilities Act; (x) the Leased Premises will be maintained by Landlord in the same condition from the date of Tenant's inspection of the Premises until the Commencement Date.

(d)     Prior to the Commencement Date, Landlord shall obtain, at Landlord's sole cost and expense, (i) an HVAC assessment of the Leased Premises, and (ii) an air quality assessment of the Clubhouse. If the HVAC assessment reveals any defects in the HVAC, then Landlord shall repair or replace the HVAC to cure the defects prior to the Commencement Date. If the air quality assessment results are not satisfactory to Tenant, then Tenant may, at its election, either (i) terminate this Lease, or (ii) cause Landlord to remediate the air quality.

(e)     It is understood and agreed that access to the Excluded Property as well as certain shared parking rights shall be retained by Landlord, and/or tenants occupying the Excluded Property, as indicated on **Exhibit B**. Further, Landlord reserves the right to record any reasonable and appropriate reciprocal easement regarding access as between the Leased Premises and the Excluded Property, and Tenant shall reasonably cooperate with regard to execution of such an easement if requested by Landlord.

**2.     COMMENCEMENT AND ENDING DATE.**  The term of this Lease shall commence on April 1, 2018 ("Commencement Date").  The term of this Lease shall end on the last day of the fifth (5th) consecutive "**Lease Year**" (defined in Section 4, below) after the "Rent Commencement Date" (defined in Section 5, below).  Such term shall be called the "Original Term".  Any reference in this Lease to the "term of this Lease", or words of similar import, shall refer to the Original Term and any additional period or periods for which such term shall have been extended.

**3.     OPTIONS TO EXTEND THE TERM.**  Tenant shall have the right to extend the term of this Lease for two (2) additional periods of five (5) years each (each, an "Extension Period") from the date upon which it would otherwise end, on the same terms and conditions as those specified in this Lease.  Any right to extend the term of this Lease shall be considered as having been exercised by Tenant, unless Tenant gives Landlord notice of Tenant's election not to exercise an option to extend the term at least ninety (90) days prior to the expiration of the Original Term or the Extension Period then in effect.

**4.     LEASE YEAR.**  The term "Lease Year" as used herein shall mean a period of twelve (12) consecutive full calendar months.  The first Lease Year shall commence on the Rent Commencement Date

(defined below). If the Rent Commencement Date shall not occur on the first day of a calendar month, the first Lease Year shall commence upon the first day of the calendar month following the Rent Commencement Date. Each succeeding Lease Year shall commence upon the anniversary date of the first Lease Year.

## 5.     RENT.

(a)     Fixed Rent. Landlord shall provide Tenant a two (2) calendar month Monthly Fixed Rent abatement period beginning on the April 1, 2018. Commencing on June 1, 2018 ("Rent Commencement Date"), Tenant shall pay Landlord a fixed annual rent per Lease Year in the amount of Seventy Five Thousand and 00/100 Dollars ($75,000.00) ("Fixed Rent"), payable in equal monthly installments of Six Thousand Two Hundred Fifty and 00/100 Dollars ($6,250.00) ("Monthly Fixed Rent"), in advance, on or before the fifteenth (15th) day of each month. If Monthly Rent is payable for a fraction of a month, the amount payable shall be a pro rata portion of Monthly Rent, prorated on a per diem basis, with respect to the fractional calendar month.

(b)     Monthly Percentage Rent. Landlord shall provide Tenant a one (1) calendar month Monthly Percentage Rent abatement period beginning on April 1, 2018. Commencing on May 1, 2018, Tenant shall pay Landlord an amount equal to five percent (5.00%), of Tenant's Gross Revenue for the prior calendar month ("Monthly Percentage Rent"), in arrears, on or before the fifteenth (15th) day of each month. Tenant's obligation to pay the Monthly Percentage Rent for the last calendar month of the Original Term or Extended Period, as may be applicable, shall survive closing. "Gross Revenue" means all revenues and income of any nature derived directly or indirectly from the Leased Premises or from the use or operation thereof, including, but not limited to, greens fees, gross sales proceeds from the sale of memberships to the Golf Course, monthly dues from members of the Golf Course, rental fees for golf carts, golf clubs and other rental item fees, lesson fees (but only to the extent such fees are retained by the Tenant), range ball fees, telephone, telegraph, telecopier and telex revenues, revenue generated from tournaments and other group gatherings, merchandise sales, rental or other payments from lessees and sublessees (but not including the gross receipts of such lessees and sublessees), and the proceeds of business interruption, use, occupancy or similar insurance. There shall be excluded from Gross Revenue: (i) any gratuities or service charges distributed as compensation to Tenant's employees; (ii) any credits or refunds made to customers, guests or patrons; (iii) any sums and credits received by Tenant for lost or damaged merchandise; (iv) any sales taxes, excise taxes, gross receipt taxes, admission taxes, entertainment taxes, tourist taxes or charges; (v) any proceeds from the sale or other disposition of the Leased Premises or other capital assets; (vi) any property and/or liability insurance proceeds (other than business interruption insurance); (vii) any condemnation awards or receipts from sales of capital assets under the threat of condemnation other than any award made in a temporary taking and in the nature of an award for lost income; (viii) any proceeds of financing or refinancing of the Facility; and (ix) amounts contributed by Landlord pursuant to the terms of this Agreement; (x) Food and Beverage Gross Revenue as defined and contemplated in Section 5(c) below . Gross Revenues shall be determined on an accrual basis and in accordance with generally accepted accounting principles, consistently applied ("GAAP"). Monthly Fixed Rent and Monthly Percentage Rent are sometimes collectively referred to herein as "Rent."

(c)     Food and Beverage Percentage Rent. Beginning on the Commencement Date Tenant shall commence food and beverage percentage rent payments to Landlord in an amount equal to five percent (5.00%), of Food and Beverage Gross Revenue for the prior calendar month ("F&B Percentage Rent"), in arrears, on or before the fifteenth (15th) day of each month. Tenant's obligation to pay the F&B Percentage Rent for the last calendar month of the Original Term or Extended Period, as may be applicable, shall survive closing. "Food and Beverage Gross Revenue" means all revenues and income of any nature derived directly or indirectly from food and beverage sales at the Clubhouse or otherwise related to operation of the Leased Premises by Tenant, including, food and beverage sales, liquor sales, and revenue generated from

Clubhouse space rentals and from meetings, banquets, parties, receptions, and other group gatherings. There shall be excluded from Gross Revenue: (i) any gratuities or service charges distributed as compensation to Tenant's employees; (ii) any sales taxes, excise taxes, gross receipt taxes, admission taxes, entertainment taxes, tourist taxes or charges. Food and Beverage Gross Revenues shall be determined on an accrual basis and in accordance with generally accepted accounting principles, consistently applied ("**GAAP**").

     (d)    <u>Maximum Monthly Rent</u>. The aggregate amount of Monthly Fixed Rent and Monthly Percentage Rent per calendar month shall not exceed Ten Thousand and 00/100 Dollars ($10,000.00), per month, until the date of completion of Landlord's Main Level Renovation. If such date does not fall on the beginning of a calendar month, then the maximum monthly rent limitation herein shall terminate beginning the following calendar month.

     (e)    All payments hereunder shall be paid when due without demand at the office of Bristol Preservation, LLC, c/o Mitch Walters, Manager, 1954 West State Street, Bristol, Tennessee 37620. All amounts shall be made payable to Bristol Preservation, LLC.

     (f)    The Rent Commencement Date and Tenant's obligation to pay Monthly Percentage Rent shall not commence and shall be extended daily until such time as (i) Landlord completes remediation or repairs to the Leased Premises so that Landlord's representations and warranties as set forth in Section 1(c) are true and accurate, if such representations and warranties should be or become untrue or inaccurate in any way prior to the Rent Commencement Date, (ii) Tenant, with the cooperation of Landlord, receives (y) all licenses necessary to operate the Leased Premises pursuant to this Lease, including, but not limited to, the liquor license and licenses required by any county, municipal, state, federal or other governmental authority, and (z) notice of approval of all required inspections of the Leases Premises by any county, municipal, state, federal or other governmental authority, and (iii) Landlord's Initial Work is complete.

**6.    PEACEFUL POSSESSION.** The Landlord covenants that the Tenant, on performing the covenants and conditions in this Lease contained, shall and may peaceably and quietly have, hold and enjoy the demised Premises for the term aforesaid.

**7.    LANDLORD'S WORK.**

     (a)    On or before the Commencement Date, Landlord, at Landlord's sole cost and expense, shall, to Tenant's reasonable satisfaction: (i) repair the HVAC if required pursuant to Section 1(d), (ii) remediate the air quality of required pursuant to Section 1(d), (iii) clean all carpets in the lower level of the Clubhouse, (iv) cause the pro shop, bathrooms, and two offices located on the lower level of the Clubhouse to be operational (collectively, the "Landlord's Initial Work").

     (b)    On or before April 30, 2018, Landlord, at Landlord's sole cost and expense, shall, to Tenant's reasonable satisfaction, complete the improvements detailed on **Exhibit E** attached hereto and incorporated herein by reference (the "Second Phase Interior Improvements").

     (c)    On or before ninety (90) days after the Commencement Date, Landlord, at Landlord initial cost and expense, as partially repaid by Tenant pursuant to this Section 7(c), shall, to Tenant's reasonable satisfaction, complete the improvements detailed on **Exhibit F** attached hereto and incorporated herein by reference (the "Third Phase Interior Improvements"). All costs and expenses incurred by Landlord directly related to the Third Phase Interior Improvements shall initially be paid by Landlord. The cost of only those Third Phase Interior Improvements specifically indicated on Exhibit F shall be partially repaid by Tenant to Landlord as follows: Monthly Fixed Rent shall be increased by the amount that is one-half (1/2) of the cost of the Third Phase Interior Improvements, amortized over two hundred forty (240) months at an interest rate of four percent (4.00%), per annum, with a balloon payment for the full amount, less the amount paid

by Tenant, due on the date that is ten (10) years after the date of completion of the Third Phase Interior Improvements; at such time the Monthly Fixed Rent shall be reduced by the amortized payment amount. Monthly Fixed Rent shall not increase until (i) the Third Phase Interior Improvements are complete; and (iii) Landlord and Tenant execute an Addendum memorializing the Monthly Fixed Rent increase. If Landlord fails to complete the Third Phase Interior Improvements on or before ninety (90) days after the Commencement Date, then all Rent and shall abate until the Third Phase Interior Improvements are complete.

(d)        On or before one hundred twenty (120) days after the Commencement Date, Landlord, at Landlord initial cost and expense, as repaid by Tenant pursuant to this Section 7(d), shall, to Tenant's reasonable satisfaction, complete the improvements detailed on **Exhibit G** attached hereto and incorporated herein by reference (the "Exterior Improvements"). All costs and expenses incurred by Landlord directly related to the Exterior Improvements shall initially be paid by Landlord and repaid by Tenant to Landlord as follows: Monthly Fixed Rent shall be increased by the amount that is the cost of the Exterior Improvements, amortized over two hundred forty (240) months at an interest rate of four percent (4.00%), per annum, with a balloon payment for the full amount, less the amount paid by Tenant, due on the date that is ten (10) years after the date of completion of the Exterior Improvements; at such time the Monthly Fixed Rent shall be reduced by the amortized payment amount. Monthly Fixed Rent shall not increase until (i) the Exterior Improvements are complete; and (iii) Landlord and Tenant execute an Addendum memorializing the Monthly Fixed Rent increase. If Landlord fails to complete the Exterior Improvements on or before twenty (120) days after the Commencement Date, then all Rent shall abate until the Exterior Improvements are completed.

(e)        On or before December 31, 2018, Tenant shall prepare architectural, engineering, and design plans, along with a cost estimate, for the renovation of the main level of the Clubhouse suitable to Tenant, subject to any modifications shown in such plans or as may be required by applicable building codes or regulations (the "Renovation Plans"). Upon Tenant's delivery of the Renovation Plans to Landlord, Landlord and Tenant shall use diligent efforts to sign off on a final version of the plans within thirty (30) days; Landlord's approval of the Renovation Plans, as presented by Tenant, shall not be unreasonable withheld by Landlord. Upon approval of the Renovation Plans, but no later than February 1, 2019, Landlord shall commence renovation of the main level of the Clubhouse pursuant to the Renovation Plans ("Landlord's Main Level Renovation") (Landlord's Initial Work, the Second Phase Interior Improvements, the Third Phase Interior Improvements, the Exterior Improvements, and Landlord's Main Level Renovation are sometimes collectively referred to herein as "Landlord's Work"). Landlord shall diligently complete Landlord's Main Level Renovation. Completion of Landlord's Main Level Renovation shall be certified in writing by Landlord and the delivery of the certificate of such completion shall be delivered by Landlord to Tenant. Except as otherwise provided in this paragraph, the cost and expense of Landlord's Main Level Renovation shall be paid eighty percent (80%) by Landlord and twenty percent (20%) by Tenant, including any and all change orders and overruns which are not due to the negligence of Tenant or Landlord, and changes to Landlord's Main Level Renovation which are required or mandated pursuant to applicable local, state, or federal laws, codes, rules, regulations, ordinances, or orders. Landlord shall be solely responsible for the cost of replacement of the ceiling of the main level of the Clubhouse. All change orders and cost overruns in excess of the cost estimate of the Renovation Plans must be agreed upon in writing by both Landlord and Tenant. Notwithstanding the foregoing, Landlord's monetary contribution to Landlord's Main Level Renovation shall not exceed the aggregate amount of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00.). Thereafter, Tenant shall be required to complete Landlord's Main Level Renovation at its sole expense. Payment for Landlord's Main Level Renovation shall be made by Landlord and Tenant during the progress of construction. Failure by either Landlord or Tenant to make a progress payment during Landlord's Main Level Renovation shall be a default under this Lease.

(f)     Should any mechanic's or materialmen's lien attach to the Leased Premises in connection with the Landlord's Work, Landlord shall cause such liens to be removed by payment, bonding or otherwise within twenty (20) days of Landlord's notice thereof. To the extent permitted by law, Landlord shall, and shall require all contractors and sub-contractors, to execute an agreement whereby they waive all mechanic's and materialmen's claims or liens which it or they may have against the Leased Premises from third parties on account of any services or work furnished in connection with the Landlord's Work, and upon completion of the Landlord's Work shall obtain releases of all liens and claims of whatever nature which have arisen or could arise as a result of services performed in connection with the Landlord's Work. If any lien or claim is filed in connection with the Landlord's Work, Landlord shall indemnify, defend and hold Tenant harmless from all costs, expenses and judgments (including reasonable attorneys' fees) arising therefrom.

Landlord acknowledges and agrees that Landlord's completion of Landlord's Main Level Renovation was a material inducement for Tenant to enter into this Lease. If Landlord fails to commence Landlord's Main Level Renovation on or before February 1, 2019, and provided that such failure to commence is not the result of a breach of this Lease by Tenant, then Tenant may elect to (i) continue under this Lease without the completion of Landlord's Main Level Renovation, except that Tenant shall only pay Monthly Fixed Rent (excluding such amounts amortized in Sections 7(c) and (d) above), and Tenant shall have the right to terminate this Lease at any time prior to the commencement of the Landlord's Main Level Renovation upon thirty (30) day written notice to Landlord and; or (ii) commence Landlord's Main Level Renovation on behalf of Landlord, whereupon Tenant shall only pay Monthly Fixed Rent (excluding such amounts amortized in Sections 7(c) and (d) above). If Tenant elects to commence Landlord's Main Level Renovation on behalf of Landlord, then (i) Tenant shall have the right to terminate this Lease at any time upon ninety (90) day written notice to Landlord, and (ii) Tenant shall have one (1) additional five (5) year option to extend the Term of this Lease (totaling three (3) additional periods of five (5) years each).

8.      **MAINTENANCE AND REPAIRS; TENANT IMPROVEMENTS; FIXTURES.**

(a)     During the term of this Lease and any and all renewals or extensions thereof, Tenant shall keep the Leased Premises in a clean, neat, safe and orderly condition, and engage in such normal and necessary day to day maintenance required to maintain the Leased Premises. Landlord shall keep the foundations, structure, and roof of the Leased Premises, in good order and repair. Except as otherwise specifically provided by this Lease, Tenant shall not be required to make any Capital Improvements to the Leased Premises. For purposes of this Lease, "Capital Improvements" mean any alternation or addition to, or rebuilding or renovation of, the Leased Premises, the cost of which is not commonly charged to property operation maintenance. Any improvements of the Leased Premises up to $25,000.00 per Lease Year shall be the sole responsibility of Tenant.

(i)     If, in Tenant's reasonable discretion, improvements of the Leased Premises greater than $25,000.00 in a Lease Year are required, then Tenant shall provide Landlord written notice of such required improvements. Within thirty (30) days of receipt of written notice by Tenant, Landlord may either: (i) decline to complete the improvements, or (ii) agree to complete the improvements, which cost shall be amortized over two hundred forty (240) months and Monthly Fixed Rent shall be increased by such monthly amortized amount for the balance of the Original Term and Extension Period, if applicable.

(ii)    If Landlord declines to complete the improvements, then Tenant may either: (i) terminate this Lease upon thirty (30) day written notice to Landlord whereby Tenant shall have no further obligation to Landlord under this Lease, or (ii) complete the improvements, which cost shall be amortized over two hundred forty (240) months and Rent due under Section 5 shall be reduced by such monthly amortized amount for the balance of the Original Term and Extension Period, if applicable.

(iii)    If Tenant delivers the thirty (30) day written notice of termination to Landlord pursuant to Section 8(a)(ii), but Landlord then commences the improvements within such thirty (30) day period, then this Lease shall remain in full force and effect and the cost of the improvements shall be amortized pursuant to Section 8(a)(i)

(b)    Tenant may make non-structural alterations, interior decorations, improvements or additions to the Leased Premises or attach any fixtures or equipment thereto without the Landlord's prior written consent. Tenant shall have the right to place in or on the Premises trade fixtures, furnishings, personal property, equipment, and materials necessary to perform its services or any other services required or authorized hereunder. Such trade fixtures, furnishings, personal property, equipment, and materials, shall remain the property of Tenant. Tenant shall remove such fixtures, furnishings, personal property, equipment, and materials upon the expiration of this Lease.

(c)    Should any mechanic's or materialmen's lien attach to the Leased Premises in connection with the Tenant's improvements, Tenant shall cause such liens to be removed by payment, bonding or otherwise within twenty (20) days of Landlord's notice thereof. To the extent permitted by law, Tenant shall, and shall require all contractors and sub-contractors, to execute an agreement whereby they waive all mechanic's and materialmen's claims or liens which it or they may have against the Leased Premises from third parties on account of any services or work furnished, and upon completion of the Tenant's improvements shall obtain releases of all liens and claims of whatever nature which have arisen or could arise as a result of services performed in connection with Tenant's improvements. If any lien or claim is filed in connection with the Tenant's improvements, Tenant shall indemnify, defend and hold Landlord harmless from all costs, expenses and judgments (including reasonable attorneys' fees) arising therefrom.

**9.    TENANT'S OPERATING RESPONSIBILITIES.** Tenant agrees it will manage and operate the Golf Course, Clubhouse, and other facilities located at the Leased Premises on a continual basis through the term of this Lease and in a professional and competent manner, consistent with the management and operational practices at golf courses similar to Golf Course in Tennessee and surrounding areas.

**10.    TITLE TO LEASED PREMISES.** Landlord represents and warrants that it has good and marketable title to the Leased Premises in fee simple, free and clear of all contracts, leases, tenancies, agreements, restrictions, violations, mortgages and other liens, encumbrances or defects in title of any nature whatsoever, except as set forth on **Exhibit H** attached hereto.

**11.    ENVIRONMENTAL.** Tenant hereby covenants and agrees that it shall not bring or transport onto the Premises, or use or store in, on, or about the Leased Premises, or in the vicinity thereof, in connection with its use and occupancy of the Leased Premises, or permit any other party to do any of the foregoing, any environmentally hazardous materials, substances, or waste of any nature that is classified as such by any county, municipal, state, federal or other governmental authority, except to the extent necessary for the customary operation of the Golf Course pursuant to industry standards. Tenant agrees to indemnify Landlord and save it harmless from and against any and all claims, losses, actions, damages, liabilities and expenses, including reasonable legal fees and expenses, reasonable clean-up costs suffered or incurred by Landlord, and any and all costs or expenses relating to the testing of or for any and all such hazardous materials, substances, asbestos, or waste of any nature, for or on account of or arising from or in connection with any breach of Tenant's warranties, representations or obligations under this section, or in connection with any condition created by Tenant as the result of any spill, discharge or release of any environmentally hazardous materials, substances or waste in, on or about the Leased Premises, or in the vicinity thereof. Tenant shall have no obligation or liability under this Lease by reason of the presence of any hazardous substances present or existing on or in any portion of the Leased Premises on or before the Commencement Date, except to the extent caused by the actions or omissions of Tenant. Landlord agrees to indemnify

Tenant and save it harmless from and against any and all claims, losses, actions, damages, liabilities and expenses, including reasonable legal fees and expenses, reasonable clean-up costs suffered or incurred by Tenant, and any and all costs or expenses relating to the testing of or for any and all such hazardous materials, substances, asbestos, or waste of any nature, for or on account of or arising from or in connection with the presence of any hazardous substances present or existing on or in any portion of the Leased Premises on or before the Commencement Date.

**12.    LIENS AND TAXES.** If possible, Landlord shall arrange to have all notices concerning tax assessments, changes in assessments, tax rates and changes, and tax bills (collectively, "Tax Bills") sent directly from the applicable governmental authorities to Tenant. If Landlord is not able to arrange to have Tax Bills sent directly to Tenant, then Landlord shall supply Tenant with copies of all Tax Bills within ten (10) days of receipt by Landlord. Tenant shall pay the Tax Bills prior to the date such Tax Bills become past due.

**13.    UTILITY CHARGES.** Beginning on the Commencement Date, Tenant shall pay all rents and charges for water and sewer services and all costs and charges for gas, heat, light, electricity, power, telephone and any other utility or service used or consumed in or servicing the Leased Premises.

**14.    GOVERNMENT REGULATION.** At Tenant's expense, Tenant will comply with all laws, rules, regulations, decisions, codes, orders or ordinances of any federal, state or municipal government, or their appropriate regulatory agencies, now in force during the term of this Lease or which may hereafter be in force, relating to the carrying on of Tenant's business on the Leased Premises.

**15.    SUBORDINATION AND NON-DISTURBANCE.** This Lease is subject and subordinate to any ground lease or any mortgage now or hereafter affecting or covering the Leased Premises. Notwithstanding the aforesaid subordination, in the event of the foreclosure of any such ground lease or mortgage; (a) this Lease shall not terminate; and (b) the peaceful possession of Tenant agrees to attorn to and to recognize the mortgagee or the purchaser at foreclosure sale as Tenant's landlord for the balance of the term of this Lease.

**16.    REPRESENTATIONS.** Landlord represents and warrants that: (a) Landlord has the full right, power, and authority to enter into this Lease and to perform its covenants for the entire tenancy created hereby; (b) if not a natural person, Landlord is duly organized or formed and in good standing under the laws of the state of its organization or formation, and Landlord is qualified to do business in the State of Tennessee. The undersigned is duly authorized to execute and deliver this Lease, and all necessary action to authorize the execution and delivery of this Lease has been properly taken; (c) to the best of Landlord's knowledge there are no violations of any federal, state, county or municipal law, code, ordinance, order, regulation, rule or requirement affecting the Leased Premises, including, but not limited to, those relating to zoning, subdivision, environmental, building, fire and health, and no written notice asserting any violation has been received by Landlord; (d) Landlord has not received notice of any pending or, to Landlord's knowledge, threatened litigation affecting the Leased Premises; (e) Landlord has not received written notice of any pending or, to Landlord's knowledge, threatened condemnation or similar proceedings affecting the Leased Premises; (f) neither Landlord, nor any subsidiary or affiliate, nor any entity under common control with any of the foregoing is the owner of any interest (whether fee, leasehold or otherwise) of any kind or nature in any real property adjacent to the Leased Premises except the Excluded Property (g) to the best of Landlord's knowledge, there are no leases, tenancies, licenses or other rights to occupancy or use for any portion of the Leased Premises; (h) there are no existing or pending agreements of sale, options to purchase or rights of first refusal with respect to all or any portion of the Leased Premises or Excluded Property; (i) to the best of Landlord's knowledge there are no management, labor, collective bargaining, service, equipment, maintenance or other agreements affecting the Leased Premises; (j) the land use classification of the Leased Premises allows for a golf course facility; (k) there is no tax abatement or

exemption, and no tax assessment appeal has been filed against the Leased Premises for the tax year 2018; (l) Landlord has made no commitments with applicable authorities for dedications, payments or other transfers which are binding on Tenant or the Leased Premises; (m) Landlord has not received written notice claiming any defects or deficiencies that has not been corrected, from any insurance company that issued a policy on the Leased Premises; (n) there are no existing or, to Landlord's knowledge, pending restrictive covenants affecting the permitted uses Leased Premises under this Lease; and (o) all prior vendor contracts for the Leased Premises not assumed by Tenant have been terminated. Tenant acknowledges and agrees that Landlord is leasing the Leased Premises to Tenant "as is, where is" without any representations or warranties except as specifically provided in this Lease. Tenant has inspected and is fully familiar with the physical condition of the Leased Premises.

If any of the foregoing representations and warranties become false or materially misleading during the term of this Lease, Landlord shall provide Tenant with notice thereof within ten (10) days following such change. Failure to provide such notice to Tenant shall be a default of Landlord hereunder. Landlord shall indemnify and hold Tenant harmless from any representations and warranties that become false or materially misleading during the term of this Lease.

**17.     LANDLORD'S DOCUMENTS.** Landlord shall cause all documents, books, and records in its possession relevant to the operation of the Leased premises for the previous five (5) years to be delivered to tenant upon execution of this Lease, including but not limited to, member rosters, member contracts employee rosters, vendor contracts, and financial books and records of operation of the Leased Premises. Landlord shall use commercially reasonable efforts to cause all member contracts to be assigned Tenant.

**18.     SIGN AND REBRANDING.** During the term of this Original Lease Term and any Extension Period, Tenant shall have the rights, at its expense and subject to terms hereof, to place in or on the Leased Premises, a sign or signs identifying the Golf Course. Tenant shall also have the right to re-brand the Golf Course, subject to Landlord's approval, which shall not be unreasonably withheld.

**19.     EMINENT DOMAIN; DAMAGE OR DESTRUCTION OF PREMISES.**

(a)     In the event all or any material part of the Leased Premises shall be taken or condemned for any public or quasi-public use or purpose, then either party may, at its option, terminate this Lease from the time title to or right to possession of the Leased Premises shall vest in or be taken for such public or quasi-public use or purpose. Tenant shall not be entitled to receive any portion of any award made or paid to Landlord representing the property or interest of Landlord taken or damaged and Tenant hereby expressly waives and relinquishes any right or claim to any portion of any such award regardless of whether any such award includes any value attributable to Tenant's leasehold estate. However, Tenant shall have the right to claim and recover from the condemning authority, but not from Landlord, such special and separate damages as may be recoverable by Tenant independent of and without diminution of Landlord's recovery. Except as set forth above, any non-material partial taking shall be treated in the same manner as a casualty loss for which neither party elects to terminate this Lease, as provided herein.

(b)     If the Leased Premises shall be destroyed by fire or other cause, or be so damaged thereby that they are untenantable and cannot be rendered tenantable within a reasonable time from the date of such damage, considering the extent of the damage, this Lease may be terminated by either party by written notice given to the other within sixty (60) days after the event causing such untenantability in which event Rent shall cease as of the date of such untenantability and both parties shall be relieved of all further liability hereunder accruing after the effective cancellation date. If the damage or destruction is not sufficient to permit a termination of the Lease as above provided, a proportionate reduction shall be made in the Rent herein reserved corresponding to the time during which, and applicable to the portion of the Leased Premises of which, Tenant shall be deprived of possession.

**20.    RIGHT OF FIRST REFUSAL.** If Landlord receives an acceptable bona fide offer to lease or purchase the Leased Premises and/or Excluded Property, Landlord shall submit a written copy of such offer to Tenant, giving Tenant twenty (20) days within which to elect to purchase the Leased Premises or Excluded Property, as may be applicable, on the same terms. If Tenant so elects, it shall give Landlord written notice thereof and a new contract embodying the terms of the offer will be executed by Landlord and Tenant, and Landlord shall act in accordance with the terms of that offer.

**21.    DEFAULT OF TENANT.** If Tenant fails to perform any of the terms, provisions, covenants or conditions to be performed or complied with by Tenant under this Lease, Landlord shall not exercise any of Landlord's remedies against Tenant by reason of any default unless and until Landlord shall have given Tenant notice specifying the default, and unless Tenant shall have failed to remedy the default within: (i) a period of ten (10) days from the giving of notice if the default is due to the failure to pay Rent; or (ii) a period of thirty (30) days from the giving of notice for any other default, or if the remedy is such as to require a longer period of time, for such longer period, provided Tenant has promptly and in good faith commenced to remedy the default and diligently continues to do so. All remedies provided in this Lease are not exclusive. For any breach of this Lease by Tenant, Landlord may pursue any other remedy available in law or in equity. Notwithstanding anything to the contrary aforesaid, in the event of a termination of this Lease by Landlord, Landlord shall use reasonable efforts to relet the Leased Premises for a commercially reasonable term and commercially reasonable rent, provided, however, that Tenant shall remain liable for all sums which would have been payable under this Lease at such time as such amounts would have become due under the Lease from time to time, less the proceeds, if any, of reletting effected by Landlord. Notwithstanding any provision herein to the contrary, Tenant shall in no event have any liability hereunder to Landlord for consequential, special, incidental or indirect damages.

**22.    DEFAULT OF LANDLORD.** If Landlord fails to perform any of the terms, provisions, covenants or conditions to be performed or complied with by Landlord under this Lease, and the failure shall remain uncured for a period of thirty (30) days after (or if the remedy is such as to require a longer period of time, for a period of ninety (90) days, provided Landlord has promptly and in good faith commenced to remedy the default and diligently continues to do so) Tenant shall have sent written notice to Landlord specifying the failure, then Tenant may, at its option, in addition to pursuing any other remedy available in law or in equity, terminate this Lease or make such payment as Landlord's agent or perform any such term, provision, covenant or condition, and the full amount of the cost and expense entailed in curing Landlord's default (together with attorneys' fees, costs and charges in connection with any legal action which may have been brought and interest at the highest rate allowed by law) shall immediately be paid by Landlord to Tenant.

**23.    PARTIES.** All rights and liabilities herein given to, or imposed upon, the respective parties hereto, shall extend to and bind the several respective heirs, executors, administrators, successors and assigns of said parties.

**24.    ASSIGNMENT BY LANDLORD; CHANGE IN OWNERSHIP.** Landlord shall not sell, transfer, convey or otherwise assign an aggregate of more than fifty percent (50%) of the membership interest in Landlord within eighteen (18) months from the Effective Date; provided, however, that nothing herein shall prohibit any such transfer arising from the death of a member of Landlord. If Landlord sells, transfers, conveys or otherwise assigns its ownership rights in and to the Leased Premises and/or assigns its interest in this Lease (a "Transfer"), Landlord shall notify Tenant in writing of such Transfer thirty (30) days prior to the date of such Transfer and following such Transfer shall provide Tenant with a recorded copy of the deed of sale and an updated title report reflecting the Transfer and/or the assignment documents, as applicable. No right to receive Rent, or assignment of Lease or Rent hereunder shall be binding upon Tenant unless Tenant shall have been furnished with an executed copy of the instrument evidencing or

creating such change or assignment. All of the foregoing shall first be subject to, and shall not in any way act to eliminate, the Right of First Refusal of Tenant set forth in Section 20 above.

**25.     ASSIGNMENT BY TENANT; CHANGE IN OWNERSHIP.**     Tenant may not assign or encumber this Lease or sublet the Leased Premises, either in whole or in part, without the prior written consent of Landlord, such consent not to be unreasonably withheld.  Consent to one assignment or subletting shall not be deemed consent to any other.  The transfer of the majority of the voting stock of Tenant, if Tenant is a corporation, the transfer of a majority of the membership or partnership interest in Tenant, if Tenant is a partnership or limited liability company, and any transfer by operation of law shall be deemed assignments requiring Landlord's consent.  In the event of any assignment or subletting for which the Landlord has consented to, Tenant shall remain fully responsible under this Lease.

**26.     NOTICE.**  All notices required to be sent under this Lease shall be in writing and shall be deemed to have been duly given or made as of (i) the date delivered if personally delivered or overnight courier, or (ii) the date received if transmitted by fax machine or e-mail to the other party as evidenced by a fax confirmation or an e-mail delivery receipt, in all cases to the respective parties addressed as follows (or to such other address as either party shall later designate by written notice to the other):

If intended for Tenant:                          If intended for Landlord:

9130 Galleria Court, Suite 100               Bristol Preservation, LLC
Naples, Florida 34109                            c/o Mitch Walters
                                                          1954 West State Street
                                                          Bristol, TN  37620

With a required copy to:

Law Office of Matthew P. Flores
Attn: Matthew P. Flores, Esq.
9130 Galleria Court, Suite 105
Naples, Florida 34109

**Notwithstanding the foregoing, all default and termination notices shall also be given by a nationally recognized overnight courier.**  Notices may be given by an attorney representing the party giving such notice.

**27.     CAPTIONS AND SECTION NUMBERS.**  The captions and section numbers appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of such sections of this Lease.

**28.     BROKER'S COMMISSION.**  Landlord and Tenant represent that they have not dealt with any real estate broker in connection with this transaction, there are no claims for brokerage commissions or finder's fees in connection with the execution of this Lease, and Landlord shall indemnify, defend and save harmless Tenant from and against all claims for any such charges or commissions made by anyone. Landlord shall be solely responsible to pay any brokerage commissions arising from this Lease.

**29.     PARTIAL INVALIDITY.** If any term, covenant or condition of this Lease or the application thereof to any person or circumstances shall be invalid or unenforceable, the remainder of this Lease or the application of such term, covenant or condition to persons or circumstances other than those as to whom it is held invalid or unenforceable shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and be enforceable to the fullest extent permitted by law.

**30.     NO AGENCY.** Nothing contained herein shall be deemed by the parties hereto, or by any third party, as creating a relationship of principal and agent, or of partnership, or of joint venture between the parties. Neither the method of computation of Rent nor any other provision contained herein nor any acts of the parties shall begin to create any relationship between the parties except the relationship of landlord and tenant.

**31.     ESTOPPEL.** Each party agrees at any time and from time to time, not later than thirty (30) days following written request by the other party, to execute, acknowledge and deliver to the requesting party a statement in writing directed to such party as is directed by the requesting party certifying that: (i) this Lease is unmodified and is in full force and effect (or if there have been modifications, that the same is in full force and effect as modified, and stating the modifications); (ii) that to the actual knowledge of the certifying party, there have been no defaults thereunder by the requesting party (or if there have been defaults, setting forth the nature thereof); (iii) the date to which the Rent and other charges have been paid, in advance, if any; and (iv) the amount of Rent and other charges then being paid pursuant to the terms hereof. It is intended that any such statement delivered pursuant to this section may be relied upon by any prospective purchaser or mortgagee of all or any portion of Landlord's interest herein, or mortgagee of all or any portion of Tenant's interest herein or any permitted assignee of Tenant's interest hereunder. In the event a party requests more than one estoppel within a 365 day period, then simultaneously with any request to review or execute such an estoppel, the requesting party shall send to the other party a check payable to such receiving party in the amount of Three Hundred Seventy-Five Dollars ($375.00) as an administrative fee for the processing of such estoppel.

**32.     INSURANCE.**

     (a)     Beginning on Commencement Date, Tenant shall maintain and keep in effect throughout the term of this Lease insurance on an occurrence basis against claims for personal injury (including death) and property damage arising from occurrences on or in the Leased Premises, with broad form contractual liability coverage, under a policy or policies of commercial general liability insurance, with such limits as may be reasonably determined by Tenant from time to time, naming Landlord as an additional insured, but not less than One Million Dollars ($1,000,000.00) per occurrence and Two Million Dollars ($2,000,000.00) in the aggregate.

     (b)     Beginning on the Commencement Date, Tenant shall keep the Leased Premises insured against loss or damage by fire and the other perils covered under a standard "All Risk" or "Special Form" policy of insurance, insuring loss or damage to the Leased Premises in the amount of the full replacement value of the Landlord's Work.

     (c)     Tenant shall maintain worker's compensation insurance in the statutory amount covering all employees of Tenant employed or performing services at the Leased Premises.

**33.     FORCE MAJEURE.** An event of "Force Majeure" means any event or circumstance that delays or otherwise adversely and materially affects the performance of an obligation under this Lease, to the extent that such event or circumstance is beyond the reasonable control of the obligor, including without limitation:

     (a)     Strikes, lockouts, labor disputes, inability to procure materials, failure of utilities, labor shortages, governmental preemption in connection with a national emergency, or explosions on the Leased Premises;

     (b)     Acts of God, tornadoes, hurricanes, floods, sinkholes, landslides, earthquakes, epidemics and /or, quarantine;

     (c)     Acts of a public enemy, acts of war, terrorism, riot; civil insurrection, effects of nuclear radiation, blockades, insurrections or riots;

     (d)     The discovery of a site of archaeological significance; and

     (e)     A legal challenge to Tenant's construction on or intended use of the Leased Premises.

In the event of a Force Majeure, the time for the obligor's performance of the pertinent obligation will be extended one day for each day of actual delay as a result of the occurrence of the event of Force Majeure. Upon termination of any delay due to an event of Force Majeure, the parties hereto agree that, upon the request of either party, they will enter into a memorandum agreement showing the effect of the delay upon the dates and time schedules provided for under this Lease.

**34.**    **MUTUAL INDEMNIFICATION.**  Tenant shall indemnify Landlord, its members, managers, officers, directors, principals, agents, successors, assigns against, and hold Landlord harmless from, any and all losses, damages, claims, liabilities, demands, causes of action, judgments, court costs, legal expenses (including reasonable out of pocket attorneys' fees and expenses) which including all reasonable out of pocket expenses incidental thereto, for damage to property or injury to or death of any person occurring on the Leased Premises and caused by Tenant's negligent act or omission or the negligent act or omission of Tenant's employee, contractor or agent. Landlord shall indemnify Tenant its members, managers, officers, directors, principals, agents, successors, assigns against, and hold Tenant harmless from, all claims, liabilities, demands or causes of action, including all reasonable expenses incidental thereto, for damage to property or injury to or death of any person occurring on caused by Landlord's negligent act or omission or the negligent act or omission of Landlord's employees, contractors or agents. The provision shall survive the expiration or termination of this Lease.

**35.**    **AUTHORITY:**  If Tenant is a business entity, each individual executing this Lease on behalf of said business entity represents and warrants that s/he is duly authorized to execute and deliver this Lease on behalf of said business entity in accordance with the duly adopted resolution of the governing body of said business entity or in accordance with the by-laws or operating agreement of said business entity and that this Lease is binding upon said business entity in accordance with its terms.

**36.**    **NO JOINT VENTURE:**  Nothing contained in this Lease shall be deemed to create a joint venture relationship between Landlord and Tenant.

**37.**    **ACCORD AND SATISFACTION:**  No payment by Tenant or receipt by Landlord of a lesser amount than any payment of rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy provided for in this Lease or available at law or in equity.

**38.**    **WAIVER OF JURY TRIAL:**  The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any

matters whatsoever arising out of or any way connected with this lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Leased Premises, and/or any claim of injury or damage. THIS WAIVER IS KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY EACH PARTY AND EACH PARTY EXPRESSLY ACKNOWLEDGES THAT NEITHER THE OTHER PARTY NOR ANY PERSON ACTING ON BEHALF OF THE OTHER PARTY HAS MADE ANY REPRESENTATIONS OF FACT TO INCLUDE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. EACH PARTY ACKNOWLEDGES TO THE OTHER THAT IT HAS READ AND UNDERSTANDS THE MEANING AND EFFECT OF THIS WAIVER PROVISION.

39.     **ENTIRE AGREEMENT.** This Lease, and the exhibits attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Leased Premises. There are no covenants, promises, agreements, conditions or understandings, either written or oral, between the parties other than as herein set forth. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by both parties.

40.     **OPTION TO PURCHASE.**

(a)     Landlord, in consideration of the execution and delivery of this Lease, hereby grants the Tenant the exclusive option to purchase the Leased Premises (collectively, the "Option Property"), provided that Tenant is not in default and upon the terms and conditions contained in this Section 40 (the "Purchase Option"). Tenant's exclusive Purchase Option shall run during the Original Term ("Option Period"). The Purchase Option must be exercised by Tenant prior to the expiration of the Option Period by Tenant giving written notice to Landlord, delivered in accordance with Section 25 hereof. If Tenant fails exercise the Purchase Option prior to expiration of the Option Period, then the Purchase Option shall automatically terminate.

(b)     Upon proper exercise of the Purchase Option by Tenant, the parties shall be bound by and shall proceed in accordance with the following terms and conditions to effectuate consummation of the purchase and sale transaction:

(i)     The total purchase price for the Option Property shall be Two Million Two Hundred Fifty Thousand and 00/100 Dollars ($2,250,000.00) plus (i) the amount expended by Landlord on Landlord's Main Level Renovation, (ii) the amount expended by Landlord on those specifically identified Third Phase Interior Improvements as indicated by asterisk on **Exhibit F**, less the amount repaid by Tenant to Landlord pursuant to Section 7(c) above, and (iii) the amount expended by Landlord on the Exterior Improvements, less the amount repaid by Tenant to Landlord pursuant to Section 7(d) above (collectively, "Purchase Price").

(ii)     Closing shall be facilitated through the exchange of customary closing documents and the Purchase Price via a closing agent selected by Tenant.

(ii)     At closing, the parties shall pay for all expenses and costs customary for a real estate transaction in Sullivan County, Tennessee, including the proration of real estate taxes and assessments.

(c)     Landlord shall notify Tenant of any application made to subdivide the Leased Premises or Excluded Property and Tenant is hereby authorized to participate in such subdivision approval process.

41.     **Expiration, Termination.**

(a)     Surrender of Leased Premises.  The voluntary or other surrender of this Lease by Tenant shall not automatically work a merger of Landlord's and Tenant's estates, only pursuant to the provisions of this Section 41.  At the option of Landlord, such a surrender shall terminate all or any existing subleases or subtenancies, or may, at the option of Landlord, operate as an assignment to it of any or all such subleases or subtenancies.  If Tenant is requested by Landlord to remove any personal property from the Leased Premises upon the termination of this Lease and shall have failed to remove same, Landlord may, at its option, remove Tenant's personal property in the manner Landlord may choose and store said personal property without liability to Tenant for the loss thereof.  Tenant shall pay Landlord on demand any and all expenses incurred in such removal and storage, including, without limitation, reasonable court costs and attorney's fees.  All such property not removed from the Leased Premises or retaken from storage by Tenant within thirty (30) days after expiration or earlier termination of this Lease or Tenant's right to possession shall, at Landlord's option, be conclusively deemed to have been conveyed by Tenant to Landlord as if by bill of sale without payment by Landlord.  Unless prohibited by applicable law, Landlord shall have a lien against such property for the costs incurred in removing and storing the same.  Landlord may, in its sole and absolute discretion, without notice, sell the personal property or any part thereof at private sale and without legal process for such price as Landlord may obtain.  Landlord shall apply the proceeds of the sale first upon the expense incident to the removal and sale of the personal property, apply the balance to any amounts due from Tenant to Landlord pursuant to this Lease, and pay any additional balance, without interest, to Tenant.

(b)     Tenant's Obligations. Upon the expiration or earlier termination of this Lease, Tenant shall promptly:

(i)     peaceably and quietly surrender and deliver to Landlord the Leased Premises together with all furniture, fixture and equipment (not including those owned by Tenant) in at least as good condition and repair as it was on the Commencement Date, reasonable wear and tear excepted;

(ii)     deliver to Landlord or such other person or entity as Landlord shall designate, all materials, supplies, equipment, keys, contracts, documents, files, books and records pertaining to this Lease and the management, operation and maintenance of the Leased Premises, excluding (i) items which are solely the books and records of Tenant and which are not reasonably necessary for the ongoing operation of the Leased Premises; (ii) such furniture, fixtures, inventory and equipment that has become obsolete, inoperable, broken, or its useful life has expired during the term of this Lease; and (iii) such furniture, fixtures, inventory, and equipment that were purchased by Tenant during the term of this Lease even if such purchased furniture, fixtures, inventory, and equipment replaced Landlord's previously existing furniture, fixtures, inventory, and equipment.

(iii)     at Landlord's request, assign all existing contracts relating to the management, operation and maintenance of the Leased Premises to Landlord or such other person or entity as Landlord shall designate (provided, however, that Landlord shall have the right, but shall not be obligated to, accept any contract assignment);

(iv)     furnish all such information, take all such other action and cooperate with Landlord as Landlord shall reasonably require in order to effectuate an orderly and systematic termination of Tenant's services, duties, obligations and activities hereunder; provided, however, that Tenant shall not be required to produce information belonging to Tenant which is not reasonably necessary for the ongoing operation of the Leased Premises;

(v)     at Landlord's request, and to the extent legally transferable, surrender and transfer and/or assign to Landlord or any person or entity designated by Landlord, all of Tenant's right, title and

interest in and to all licenses, permits and other authorizations used by Tenant in operating and/or managing the Leased Premises (provided, however, that Landlord shall have the right, but shall not be obligated to, accept any such transfer or assignment); and

        (vi)    conduct, and provide to Landlord, an inventory of the supplies, inventory and furniture, fixtures and equipment remaining at the Leased Premises and deliver a list of such inventory to Landlord;

    (c)    Survival. The provisions of this Article shall survive any termination of this Lease.

## 42.    MISCELLANEOUS.

    (a)    The parties agree that this Lease may be transmitted between them by facsimile machine or electronically. The parties intend that faxed or electronically transmitted signatures constitute original signatures and that a faxed or electronically transmitted Lease containing the signature (original or faxed) of all the parties is binding on the parties.

    (b)    This Lease may be signed in one or more counterparts, each of which will constitute an original and all of which together shall comprise the entire Lease. The parties mutually participated in the drafting of this Lease and no rules of construction against the drafter of this Lease shall apply in any interpretation or enforcement of this Lease or any documents executed pursuant hereto.

    (c)    This Lease shall be governed by and construed in accordance with the laws of the jurisdiction in which the Leased Premises is located. The venue for resolution of any dispute regarding this Lease shall lie within the county where the Leased Premises is located and in no other venue.

    (d)    Except as may otherwise be expressly provided, there shall be no further liability hereunder between the parties upon the termination of this Lease, except for liabilities arising prior to the date of such termination.

    (e)    Any headings preceding the text of several paragraphs and subparagraphs hereof are inserted solely for the convenience of reference and shall not constitute a part of this Lease, nor shall they affect its meaning, construction or effect.

    (f)    If any provision of this Lease is held invalid or unenforceable in any jurisdiction, such provision, shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability of such provision in any other jurisdiction or the remaining provisions of this Lease.

    (g)    Any time period provided for in this Lease which ends on a Saturday, Sunday or Federal Banking holiday shall extend to 5:00 P.M. (EST) on the next day that is not either a Saturday, Sunday or Federal Banking holiday.

    (h)    Landlord hereby waives any statutory and common law liens for Rent (other than judgment liens). Although such waiver is hereby deemed to be automatic and self-executing, Landlord hereby agrees to execute such instruments as may be reasonably required from time to time in order to confirm such waiver.

    (i)    Time is of the essence of this Lease.

(j)    Should Landlord or Tenant employ an attorney to enforce any of the provisions of this Lease, or defend any action instituted by the other party, then the prevailing party shall be entitled to be reimbursed by the other party for all reasonable costs, charges, and expenses, including attorney's fees, expended or incurred in connection therewith including same on appeal.

**IN WITNESS WHEREOF** the parties hereto have caused this Lease Agreement to be executed the dates set forth below.

**WITNESSES:**                                      **LANDLORD:**

                                                    **BRISTOL PRESERVATION, LLC,**
                                                    a Tennessee liability company

Witness _Laura Doughty_
Print Name _LAURA Doughty_                          By: _S. MITCHELL WALTERS_
                                                    Its: _MANAGER_
Witness _Emily Ann Stitner_                         Date: _4·10·2018_
Print Name _Emily Anne Stiltner_


**WITNESSES:**                                      **TENANT:**

                                                    **KOVA BRISTOL TENN 1894, LLC,**
                                                    a Florida limited liability company

Witness _Laura Doughty_
Print Name _LAURA Doughty_                          By: _Rick Rainville_
                                                    Its: _MANAGING MEMBER_
Witness _Emily Stiltner_                            Date: _4/10/18_
Print Name _Emily Stiltner_

## EXHIBIT A

## LEASED PREMISES

All of that certain parcel of land lying situate in the City of Bristol, Second Civil District of Sullivan County, Tennessee as described in that certain Special Warranty Deed of record in Book 3163, page 2127, in the Office of the Register of Deeds for Sullivan County, Tennessee, a copy of which being attached hereto, LESS and EXCEPT the Excluded Property, with said Excluded Property being that property which is the subject of that certain Memorandum of Lease of record in Book 3175, page 1879, in the Office of the Register of Deeds for Sullivan County, Tennessee, a copy of which being attached hereto as part of Exhibit D to this Agreement.

This Instrument Was Prepared by:
M. Shaun Lundy (TNSB No.: 28991)
Penn, Stuart & Eskridge
804 Anderson Street
Bristol, Tennessee 37620

THIS SPECIAL WARRANTY DEED is made and entered into this 30th day of June, 2015, by and between **FIDELIS PRAESIDIUM II, LLC**, a Virginia limited liability company, hereinafter referred to as Grantor, and **BRISTOL PRESERVATION, LLC**, a Tennessee limited liability company, hereinafter referred to as Grantee.

## W I T N E S S E T H:

That for and in consideration of the sum of One Million Five Hundred Thousand Dollars ($1,500,000), cash in hand paid, the receipt of which is hereby acknowledged, the Grantor does hereby convey unto the Grantee, its successors and assigns, that certain parcel of land lying and situate in the City of Bristol, Second Civil District of Sullivan County, Tennessee, and being more particularly described as follows:

Tract 1:

BEGINNING at an iron rod set, said rod being located N. 66° 33' 57" E., 86.25 feet from the centerline intersection of Reserve Boulevard and King College Road; thence N. 59° 42' 33" E., a distance of 237.62 feet to an iron rod in the southern right-of-way of Fairway Drive; thence leaving the southern right-of-way of Fairway Drive, S. 19° 57' 10" E., a distance of 79.50 feet to an iron rod; thence N. 70° 54' 21" E., a distance of 220.35 feet to an iron rod; thence N. 62° 36' 10" E., a distance of 264.72 feet to an iron rod; thence N. 43° 12' 16" E., a distance of 143.62 feet to an iron rod; thence N. 31° 35' 30" W., a distance of 93.46 feet to an iron rod set in the southern right-of-way of Fairway Drive; thence with the southern right-of-way of Fairway Drive, N. 59° 43' 36" E., a distance of 254.77 feet to an iron rod set; thence leaving the southern right-of-way of Fairway Drive, S. 25° 24' 17" E., a distance of 158.14 feet to an iron rod; thence N. 63° 59' 46" E., a distance of 213.79 feet to an iron rod; thence N. 60° 49' 20" E., a distance of 200.08 feet

1

Bristol: 544677-1

to an iron rod; thence N. 54° 00' 19" E., a distance of 218.38 feet to an iron rod; thence N. 33° 40' 17" W., a distance of 155.30 feet to an iron rod in the southern right-of-way of Fairway Drive; thence with the southern right-of-way of Fairway Drive, N. 59° 47' 52" E., a distance of 387.55 feet to an iron rod set; thence N. 25° 45' 02" E., a distance of 221.33 feet to an iron rod set; thence with a curve to the right having a radius of 175.00 feet, an arc distance of 137.36 feet, a chord bearing of N. 48° 14' 13" E. and a chord distance of 133.86 feet to an iron rod set; thence N. 70° 43' 23" E., a distance of 163.11 feet to an iron rod set; thence with a curve to the left having a radius of 68.00 feet, an arc distance of 78.24 feet, a chord bearing of N. 37° 45' 40' E. and a chord distance of 74.00 feet to an iron rod set; thence N. 04° 47' 57" E., a distance of 25.35 feet to an iron rod; thence leaving the southern right-of-way of Fairway Drive, S. 67° 30' 06" E., a distance of 74.67 feet to an iron rod set; thence N. 67° 35' 45" E., a distance of 114.27 feet to an iron rod; thence N. 69° 33' 45" E. a distance of 189.85 feet to an iron rod set; thence S. 20° 27' 25" E., a distance of 59.82 feet to an iron rod; thence S. 19° 10' 15" E., a distance of 199.56 feet to an iron rod; thence S. 19° 34' 10" E., a distance of 199.98 feet to an iron rod set; thence S. 21° 35' 10" E., a distance of 115.96 feet to an iron rod set; thence S. 33° 26' 10" E., a distance of 116.16 feet to an iron rod; thence S. 56° 02' 36" E., a distance of 131.54 feet to an iron rod; thence S. 71° 31' 14" E., a distance of 123.64 feet to an iron rod; thence N. 83° 10' 03" E., a distance of 198.81 feet to an iron rod set; thence N. 87° 56' 49" E., a distance of 143.93 feet to an iron rod set; thence S. 41° 13' 11" E., a distance of 250.53 feet to an iron rod set; thence S. 32° 35' 01" W., a distance of 94.40 feet to an iron rod; thence S. 33° 37' 03" W., a distance of 208.10 feet to an iron rod; thence S. 33° 36' 14" W., a distance of 200.24 feet to an iron rod; thence S. 33° 37' 06" W., a distance of 185.57 feet to an iron rod set; thence S. 56° 14' 54" E., a distance of 274.99 feet to an iron rod set in the northern right-of-way of Old Jonesboro Road; thence with the northern right-of-way of Old Jonesboro Road, S. 36° 45' 06" W., a distance of 199.86 feet to an iron rod; thence S. 40° 21' 52" W., a distance of 198.83 feet to an iron rod; thence S. 40° 57' 08" W., a distance of 845.09 feet to an iron rod set; thence S. 45° 25' 04" W., a distance of 207.54 feet to an iron rod; thence S. 59° 38' 04" W., a distance of 192.47 feet to an iron rod set; thence S. 63° 32' 04" W., a distance of 199.66 feet to an iron rod; thence leaving the northern right-of-way of Old Jonesboro Road, N. 27° 43' 13" W., a distance of 189.62 feet to an iron rod; thence S. 66° 35' 47" W., a distance of 196.29 feet to an iron rod; thence S. 63° 03' 04" W., a distance of 182.15 feet to an iron rod set; thence S. 16° 11' 56" E., a distance of 100.08 feet to an iron rod set; thence S. 26° 27' 56" E., a distance of 100.03 feet to an iron rod set in the northern right-of-way of Old Jonesboro Road; thence with the northern right-of-way of Old Jonesboro Road, S. 75° 34' 38" W., a distance of 359.56 feet to an iron rod set; thence leaving the northern right-of-way of Old Jonesboro Road, N. 20° 47' 28" W., a distance of 200.04 feet to an iron rod; thence S. 64° 54' 59" W., a distance of 103.13 feet to an iron rod; thence S. 64° 54' 02" W., a distance of 95.65 feet to an iron rod; thence S. 64° 57' 34" W, a distance of 200.43

2

Bristol: 544677-1

Case 2:19-cv-00084-DCLC-CRW   Document 1-1   Filed 05/23/19   Page 20 of 44   PageID #: 34

feet to an iron rod; thence S. 84° 01' 33" W., a distance of 149.96 feet to an iron rod set; thence continue along said line S. 84° 01' 33" W., a distance of 18.04 feet to an iron rod; thence N. 13° 29' 05" W., a distance of 238.14 feet to an iron rod set; thence N. 20° 15' 05" W., a distance of 199.95 feet to an iron rod; thence N. 17° 33' 07" W., a distance of 206.66 feet to an iron rod set; thence N. 22° 32' 07" W., a distance of 199.67 feet to an iron rod; thence N. 22° 01' 30" W., a distance of 203.41 feet to an iron rod; thence N. 24° 31' 45" W., a distance of 199.84 feet to an iron rod; thence N. 24° 17' 06" W., a distance of 200.51 feet to an iron rod set; thence S. 67° 51' 54" W., a distance of 165.29 feet to an iron rod in the eastern right-of-way of King College Road; thence with the eastern right-of-way of King College Road, N. 22° 19' 44" W., a distance of 361.79 feet to an iron rod set, the POINT OF BEGINNING, containing 6,086,439 square feet or 139.73 acres, according to the survey by Daniel P. Humphreys, R.L.S. Number 2060, dated November 29, 2005.

LESS and EXCEPT that portion of said boundary currently assessed as a part of Tax Map 022B, Group A, Parcel 025.10, being Lot 11B of the Bentley Ridge Subdivision and depicted in Plat Book 9, Page 74 and Plat Book 54, Page 305 in the Office of the Register of Deeds for Sullivan County, Tennessee.

Tract 2:

BEGINNING at an iron rod in the northern right-of-way of Fairway Drive, said rod being located N. 58° 56' 48" E., 2,062.70 feet from the centerline intersection of Reserve Boulevard and King College Road; thence leaving the northern right-of-way of Fairway Drive, N. 10° 23' 57" W., a distance of 300.00 feet to an iron rod set; thence N. 59° 42' 56" E., a distance of 47.21 feet to an iron rod; thence S. 41° 04' 28" E., a distance of 90.25 feet to an iron rod set; thence N. 70° 43' 23" E., a distance of 210.65 feet to an iron rod set in the northern right-of-way of Fairway Drive; thence with the northern right-of-way of Fairway Drive, a curve to the left, having a radius of 215.00 feet, an arc distance of 106.18 feet, a chord bearing of S. 39° 53' 57" W., and a chord distance of 105.11 feet to an iron rod set; thence S. 25° 45' 02" W., a distance of 210.76 feet to an iron rod set; thence S. 59° 47' 52" W., a distance of 99.24 feet to an iron rod set, the POINT OF BEGINNING, containing 43,465 square feet or 1.00 acre, according to the survey by Daniel P. Humphreys, R.L.S. Number 2060, dated November 29, 2005.

FAIRWAY DRIVE TRACT:

BEGINNING at the southeastern corner of Fairway Drive, said point being the northern right-of-way of Old Jonesboro Road; thence along the southern right-of-way of Fairway

Bristol: 544677-1

3

Drive, the following calls: N. 08° 36' 16" W., a distance of 33.87 feet to a point; thence N. 50° 26' 59" W., a distance of 217.55 feet to a point; thence N. 50° 21' 12" W., a distance of 244.60 feet to an iron rod; thence N. 50° 24' 11" W., a distance of 60.05 feet to a point; thence with a non tangent curve to the left having a radius of 149.87 feet, an arc distance of 122.68 feet, a chord bearing of N. 73° 47' 41" W., and a chord distance of 119.28 feet to a point; thence S. 82° 46' 49" W., a distance of 69.35 feet to an iron rod; thence continue along said line S. 82° 46' 49" W., a distance of 100.09 feet to a point; thence with a non tangent curve to the right, having a radius of 220.71 feet, an arc distance of 305.13 feet, a chord bearing of N. 57° 56' 07" W., and a chord distance of 281.40 feet to a point; thence N. 18° 31' 43" W., a distance of 63.37 feet to a point; thence N. 18° 59' 43" W., a distance of 200.87 feet to an iron rod; thence N. 19° 25' 51" W., a distance of 199.63 feet to an iron rod; thence N. 19° 03' 25" W., a distance of 161.40 feet to a point; thence with a curve to the left having a radius of 55.29 feet, an arc distance of 76.62 feet, a chord bearing of N. 58° 45' 25" W., and a chord distance of 70.64 feet to a point; thence S. 81° 32' 35" W., a distance of 122.84 feet to a point; thence with a curve to the left having a radius of 365.00 feet, an arc distance of 188.88 feet, a chord bearing of S. 66° 43' 05" W., and a chord distance of 186.78 feet to an iron rod; thence S. 51° 53' 35" W., a distance of 91.50 feet to a point; thence with a curve to the left having a radius of 115.00 feet, an arc distance of 95.60 feet, a chord bearing of S. 28° 04' 38" W., and a chord distance of 92.87 feet to a point; thence S. 04° 15' 54" W., a distance of 36.46 feet to an iron rod; thence S. 04° 47' 57" W., a distance of 25.35 feet to an iron rod set; thence with a curve to the right having a radius of 68.00 feet, an arc distance of 78.24 feet, a chord bearing of S. 37° 45' 40" W., and a chord distance of 74.00 feet to an iron rod set; thence S. 70° 43' 23" W., a distance of 163.11 feet to an iron rod set; thence with a curve to the left having a radius of 175.00 feet, an arc distance of 137.36 feet, a chord bearing of S. 48° 14' 13" W., and a chord distance of 133.86 feet to an iron rod set; thence S. 25° 45' 02" W., a distance of 221.33 feet to an iron rod set; thence S. 59° 47' 52" W., a distance of 387.55 feet to an iron rod; thence continue along said line S. 59° 47' 52" W., a distance of 207.90 feet to a point; thence continue along said line S. 59° 47' 52" W., a distance of 200.00 feet to an iron rod; thence S. 59° 43' 36" W., a distance of 200.00 feet to an iron rod set; thence continue along said line S. 59° 43' 36" W., a distance of 254.77 feet to an iron rod set; thence continue along said line S. 59° 43' 36" W., a distance of 200.00 feet to a point; thence continue along said line S. 59° 43' 36" W., a distance of 200.00 feet to an iron rod; thence S. 59° 42' 33" W., a distance of 201.86 feet to an iron rod; thence continue along said line S. 59° 42' 33" W., a distance of 34.79 feet to a point; thence leaving the southern right-of-way of Fairway Drive, N. 30° 11' 17" W., a distance of 40.93 feet to a point in the northern right-of-way of Fairway Drive; thence along the northern right-of-way of Fairway Drive, the following calls: N. 59° 48' 43" E., a distance of 1,773.99 feet to an iron rod; thence N. 59° 47' 52" E., a distance of 99.24 feet to an iron rod set; thence N. 25° 45' 02" E., a distance of 210.76 feet to an iron

Bristol: 544677-1

4

rod set; thence with a curve to the right having a radius of 215.00 feet, an arc distance of 106.18 feet, a chord bearing of N. 39° 53' 57" E., and a chord distance of 105.11 feet to an iron rod set; thence N. 70° 43' 23" E., a distance of 238.85 feet to an iron rod; thence N. 27° 46' 28" E., a distance of 13.94 feet to a point; thence N. 04° 15' 54" E., a distance of 76.74 feet to a point; thence with a non tangent curve to the right, having radius of 150.00 feet, an arc distance of 124.70 feet, a chord bearing of N. 28° 04' 38" E., and a chord distance of 121.14 feet to a point; thence N. 51° 53' 35" E., a distance of 91.50 feet to a point; thence with a curve to the right having a radius of 400.00 feet, an arc distance of 207.00 feet, a chord bearing of N. 66° 43' 05" E., and a chord distance of 204.69 feet to a point; thence N. 81° 32' 35" E., a distance of 209.95 feet to a point; thence S. 18° 31' 43" E., a distance of 698.47 feet to a point; thence with a non tangent curve to the left, having a radius of 180.71 feet, an arc distance of 250.00 feet, a chord bearing of S. 57° 56' 30" E., and a chord distance of 230.54 feet to a point; thence N. 82° 46' 49" E., a distance of 251.99 feet to a point; thence S. 50° 21' 12" E., a distance of 386.89 feet to a point; thence S. 50° 26' 59" E., a distance of 237.20 feet to a point in the northern right-of-way of Old Jonesboro Road; thence with the northern right-of-way of Old Jonesboro Road, S. 34° 29' 01" W., a distance of 62.84 feet to the POINT OF BEGINNING, containing 194,908 square feet or 4.47 acres, including a five-foot buffer strip along the northerly line of Fairway Drive, according to the survey by Daniel P. Humphreys, R.L.S. Number 2060, dated November 29, 2005.

Map 22B-A-5.00
Map 22B-A-5.00 001

BEING the same property designated as Tract 1, Tract 2 and Fairway Drive Tract in that certain Quitclaim Deed dated October 28, 2014, from TruPoint Bank to Fidelis Praesidium II, LLC, of record in Book 3137, page 2013, in the Office of the Register of Deeds for Sullivan County, Tennessee.

This conveyance is made expressly subject to any restrictions, conditions, right-of-ways and easements of record, if any, in the aforesaid Register's Office, insofar as same affect said property.

The Grantor covenants with the Grantee that it is lawfully seized and possessed of the property herein conveyed; that it has full power and authority to convey the same; that the property is unencumbered except for real estate taxes which are to being prorated as of this date with the balance assumed by the Grantee; and that it will warrant and defend title to the above described property against

5

Bristol: 544677-1

Case 2:19-cv-00084-DCLC-CRW   Document 1-1   Filed 05/23/19   Page 23 of 44   PageID #: 37

all parties lawfully claiming the same from, through or under it, but against no others, except for the exceptions hereinafter stated.

Title to the property hereinabove described is subject to any restrictions, conditions, right-of-ways and easements of record, if any, in the aforesaid Register's Office, insofar as same affect said property.

WITNESS the following signature of the Grantor on this the day and year first above written.

FIDELIS PRAESIDIUM II, LLC

By: _Cameron J. Forrester_

Name: _Cameron L. Forrester_

Title: _Manager_

6

Book 3163 Page 2180

STATE OF TENNESSEE

COUNTY OF SULLIVAN

Personally appeared before me, the undersigned notary public, Cameron L. Forrester , Manager (title) of FIDELIS PRAESIDIUM II, LLC, with whom I am personally acquainted, or whose identity was proven to me on the basis of satisfactory evidence, and who acknowledged that he executed the within instrument as Manager of FIDELIS PRAESIDIUM II, LLC, for the purposes therein contained.

Witness my hand and official seal at office in the State and County aforesaid on this 30th day of June, 2015.



Crissy Bebber

Notary Public

My commission expires: April 1, 2019

**Name and Address of Property Owner and the Person or Entity Responsible for the Payment of the Real Property Tax:**

BRISTOL PRESERVATION, LLC
P. O. BOX 1967
BRISTOL, TN 37620-1940

7

## AFFIDAVIT OF CONSIDERATION

STATE OF TENNESSEE

COUNTY OF SULLIVAN

Pursuant to TCA Section 67-4-409(a)(1), the undersigned does hereby swear or affirm that the consideration for this transfer, or value of the property, whichever is greater, is $1,500,000, which is the amount the property transferred would command at a fair and voluntary sale.

*Carver L Forrester*

Sworn to and subscribed before me this 30th day of June, 2015.

*Crissy Bebber*
Notary Public
My Commission Expires: April 1, 2019

CRISSY BEBBER
STATE
OF
TENNESSEE
NOTARY
PUBLIC
SULLIVAN COUNTY
My Commission Expires April 1, 2019

**BK/PG: 3163/2175-2182**

**15011150**

| | |
|---|---|
| 8 PGS:AL-DEED | |
| REVONDA BATCH: 88952 | |
| 06/30/2015 - 03:14:57 PM | |
| VALUE | 1500000.00 |
| MORTGAGE TAX | 0.00 |
| TRANSFER TAX | 5550.00 |
| RECORDING FEE | 40.00 |
| DP FEE | 2.00 |
| REGISTER'S FEE | 1.00 |
| TOTAL AMOUNT | 5593.00 |

STATE OF TENNESSEE, SULLIVAN COUNTY
**SHEENA R TINSLEY**
REGISTER OF DEEDS

Bristol: 544677-1

8

## EXHIBIT B

### DEPICTION OF LEASED PREMISES

See the attached general depiction of the Leased Premises, with the Leased Premises consisting of the area shown as "GOLF COURSE KNOWN AS COUNTRY CLUB OF BRISTOL" less the red hatched area shown as the "FITNESS CENTER KNOWN AS LIFESTYLES FITNESS" with said red hatched area also generally depicting the Excluded Property. The parties hereto understand and agree that the Leased Premises and the Excluded Property shall share the main access drive into the parking lots shown on the attached depiction (as one half of the access drive is part of the Excluded Property, and one half of the access drive is part of the Leased Premises), and the parties understand and agree that the parking areas depicted on the attached are subject to shared parking rights as between the Leased Premises and the Excluded Property so that the Leased Premises and Excluded Property shall have equal, uninterrupted access and use of the parking areas on the attached depiction, subject to any access/parking easement which may be permitted pursuant to this Lease.

## GOLF COURSE KNOWN AS COUNTRY CLUB OF BRISTOL



## FITNESS CENTER KNOWN AS LIFESTYLES FITNESS



# EXHIBIT C

## EQUIPMENT

# Country Club of Bristol Equipment Inventory

## Aerifiers

| Brand | Model | Units | Hours | Serial number | Owned/Leased | Pur. Price | Purch. Year | Current Value | Year to replace | Condition |
|---|---|---|---|---|---|---|---|---|---|---|
| Toro | Rough Aerifier-886 | 1 | | 90133 | Owned | | 2003 | | | |

## Triplex Mowers

| Brand | Model | Units | Hours | Serial number | Owned/Leased | Pur. Price | Purch. Year | Current Value | Year to replace | Condition |
|---|---|---|---|---|---|---|---|---|---|---|
| Toro | 3100 | 1 | | 04356-210001680 | Owned | | 2001 | | | |
| John Deere | 2500E | 1 | | | Leased | | 2017 | | | |

## Walk Mowers

| Brand | Model | Units | Hours | Serial number | Owned/Leased | Pur. Price | Purch. Year | Current Value | Year to replace | Condition |
|---|---|---|---|---|---|---|---|---|---|---|
| Toro | 1000 | 1 | | 04052-90902 | Owned | | 1999 | | | |
| Toro | 1000 | 1 | | 04052-90486 | Owned | | 1999 | | | |
| Toro | 1000 | 1 | | 04052-81353 | Owned | | 1998 | | | |
| Toro | 1000 | 1 | | 04052-81472 | Owned | | 1998 | | | |

## Sand Rakes

| Brand | Model | Units | Hours | Serial number | Owned/Leased | Pur. Price | Purch. Year | Current Value | Year to replace | Condition |
|---|---|---|---|---|---|---|---|---|---|---|
| John Deere | 1200 Hydro Pro | 1 | | | Leased | | 2017 | | | |

## Utility Vehicles Heavy Duty

| Brand | Model | Units | Hours | Serial number | Owned/Leased | Pur. Price | Purch. Year | Current Value | Year to replace | Condition |
|---|---|---|---|---|---|---|---|---|---|---|
| Toro | Workman-3300D | 1 | | 90216 | Owned | | 1999 | | | |
| Toro | Workman-4300D | 1 | | 230000152 | Owned | | 2003 | | | |

Case 2:19-cv-00084-DCLC-CRW   Document 1-1   Filed 05/23/19   Page 30 of 44   PageID #: 44

## Utility Vehicles Light Duty

| Brand | Model | Units | Hours | Serial number | Owned/Leased | Pur. Price | Purch. Year | Year to replace | Condition |
|---|---|---|---|---|---|---|---|---|---|
| Yamaha | YDRA | 1 | | JWI-214885 | Owned | | 2009 | | |
| Yamaha | YDRA | 1 | | JWI-21597 | Owned | | 2009 | | |
| Yamaha | YDRA | 1 | | JW1-215184 | Owned | | 2009 | | |
| Yamaha | YDRA | 1 | | JW1-215188 | Owned | | 2009 | | |
| Yamaha | YTFI | 1 | | JW6-000742 | Owned | | 2009 | | |

## Rough Mowers

| Brand | Model | Units | Hours | Serial number | Owned/Leased | Pur. Price | Purch. Year | Year to replace | Condition |
|---|---|---|---|---|---|---|---|---|---|
| Toro | 4500-30/56 | 1 | | 24000000884 | Owned | | 2004 | | |
| John Deere | 9009A | 1 | | | Leased | | 2017 | | Not working |

## Fairway Mowers

| Brand | Model | Units | Hours | Serial number | Owned/Leased | Pur. Price | Purch. Year | Year to replace | Condition |
|---|---|---|---|---|---|---|---|---|---|
| Toro | 6500D | 1 | | 90202 | Owned | | | | Bad Hydro |

## Tractors

| Brand | Model | Units | Hours | Serial number | Owned/Leased | Pur. Price | Purch. Year | Year to replace | Condition |
|---|---|---|---|---|---|---|---|---|---|
| John Deere | 5,205 | 1 | | | Owned | | | | |
| John Deere | Trim Mow Tractor | 1 | | | Owned | | | | |
| John Deere | 430 Long Tractor | 1 | | | Owned | | | | |
| Massy | Tractor 1190 | 1 | | | Owned | | | | |

## Sprayers

| Brand | Model | Units | Hours | Serial number | Owned/Leased | Purchase Price | Purch. Year | Year to replace | Condition |
|---|---|---|---|---|---|---|---|---|---|
| Toro | 1100 Multi Pro | 1 | | 90334 | Owned | | 1999 | | |
| John Deere | 2028 Gator | 1 | | | Leased | | 2013 | | |
| John Deere | HD 200 Tank | 1 | | | Leased | | 2013 | | |

## Topdressers

| Brand | Model | Units | Hours | Serial number | Owned/Leased | Purchase Price | Purch. Year | Year to replace | Condition |
|---|---|---|---|---|---|---|---|---|---|
| Toro | 1800 | 1 | | 80127 | Owned | | 1998 | | |
| Toro | T550 | 1 | | | | | | | Bad Motor |

1:55 PM4/8/2018CC Bristol GCM and Cart Fleet Equipment Inventory2

**Misc.**

| Brand | Model | Units | Hours | Serial number | Owned/Leased | Pur. Price | Purch. Year | Year to replace | Condition |
|---|---|---|---|---|---|---|---|---|---|
| Yamaha | Range Picker | 1 | | | Owned | | | | |
| Yamaha | Beverage Cart | 2 | | | Owned | | | | |
| John Deere | Bucket Attachment | 1 | | | Owned | | | | |
| John Deere | Homemade Forks | 1 | | | Owned | | | | |
| John Deere | 430 Snowplow Attachment | 1 | | | Owned | | | | |
| Giromill | TIP Pull Behind Brush - Greens | 1 | | | Owned | | | | |
| Salsco | Roller | 1 | | | Owned | | | | |
| Anderson | Spreader | 1 | | | Owned | | | | |
| Landpride | Overseeder | 1 | | | Owned | | | | |
| Lely | Lely Spreader | 1 | | | Owned | | | | |
| Goosen | Course Vacuum -1104 | 1 | | | Owned | | | | |
| Goosen | Vacuum Attachements | 3 | | | Owned | | | | |
| Befco | Tiller - 11-T40-25B | 1 | | | Owned | | | | |
| Meyer | Snowplow - C8 | 1 | | | Owned | | | | |
| Promovost | Trailers - P1516 | 2 | | | Owned | | | | |
| Foley | Reel Grinder | 1 | | | Owned | | | | |
| Foley | Bedknife Grinder | 1 | | | Owned | | | | |
| | Spray Tank 25 Gallon | 1 | | | Owned | | | | |
| | Spray Tank 1 Gallon | 1 | | | Owned | | | | |
| | Spray Tank 5 Gallon | 1 | | | Owned | | | | |
| | 60 Gallon Cobalt Compressor | 1 | | | Owned | | | | |
| Dewalt | Table Top Grinder | 1 | | | Owned | | | | |
| Jet | Table Top Grinder | 1 | | | Owned | | | | |
| Craftman | Miscellaneous Tools | | | | Owned | | | | |

**Golf Carts**

| Brand | Model | Units | Hours | Serial number | Owned/Leased | Pur. Price | Purch. Year | Year to replace | Condition |
|---|---|---|---|---|---|---|---|---|---|
| Yamaha | DRZA17-EFI | 51 | | | Leased | | 2016 | | |

1:55 PM4/6/2018CC Bristol GCM and Cart Fleet Equipment Inventory3

# Small Equipment

| Brand | Descr. | Qty | Model | Hours | Serial number | Date purchased |
|---|---|---|---|---|---|---|
| Stihl | Weed Eater | 2 | | | | |
| Stihl | Back Pack Blower | 1 | | | | |
| Echo | Hedge Trimmer | 1 | | | | |
| Stihl | Chainsaw | 1 | | | | |
| Stihl | Chain Pole Saw | 1 | | | | |
| John Deere | Back Pack Blower | 1 | | | | |
| | Electric Welder | 1 | | | | |
| True Performance | Drill Press | 1 | | | | |
| Ingersol Rand | Air Impact Wrench | 1 | | | | |
| Mountain | Neumatic Grinder | 1 | | | | |
| Mountain | Neumatic Grease Gun | 1 | | | | |
| Makkita | Electric Impact Wrench | 1 | | | | |
| | Back Lapping Machine | 1 | | | | |
| | Electric Grinder - Home Depot | 1 | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

## EXHIBIT D

### EXCLUDED PROPERTY

All property which is the subject of that certain Memorandum of Lease of record in Book 3175, page 1879, in the Office of the Register of Deeds for Sullivan County, Tennessee, a copy of which being attached hereto.

This instrument prepared by:

RICK J. BEARFIELD, Attorney at Law
Wesley Plaza, Suite 1
2513 Wesley Street
P.O. Box 4210 CRS
Johnson City, TN 37602
(423) 282-1006
(423) 282-3081 (fax)

BK/PG: 3175/1879-1882
15017592
4 PGS:AL-MEMORANDUM
REVONDA BATCH: 95230
10/02/2015 - 04:13:04 PM
VALUE                    0.00
MORTGAGE TAX             0.00
TRANSFER TAX             0.00
RECORDING FEE           20.00
DP FEE                   2.00
REGISTER'S FEE           0.00
TOTAL AMOUNT            22.00
STATE OF TENNESSEE, SULLIVAN COUNTY
SHEENA R TINSLEY
REGISTER OF DEEDS

For

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE, is made and entered into as of the 1st day September, 2015, by and between BRISTOL PRESERVATION, LLC ("Lessor"), a Tennessee limited liability company, and NAUTILUS FITNESS CENTER, INC., a Tennessee corporation (hereinafter referred to as "LESSEE"); which terms "LESSOR" and "LESSEE" shall include, wherever the context admits or requires, singular or plural, and the successors and assigns of the respective parties;

### W I T N E S S E T H

That the LESSOR, in consideration of the covenants of the LESSEE, does hereby lease and demise unto said LESSEE and the LESSEE hereby agrees to take and lease from the LESSOR, for the term hereinafter specified, the following described premises:

ALL AND SINGULAR, that certain piece, parcel or tract of land situate, lying, and being in the City of Bristol, County of Sullivan, Tennessee, consisting of approximately 5.8507 acres, more or less, and more particularly shown on Exhibit A hereto attached.

FOR THE LESSEE TO HAVE AND TO HOLD from for an initial term of Two (2) years.

The Lease also grants to Lessee the option to extend and renew the lease for three (3) separate and successive periods of five (5) years each.

Case 2:19-cv-00084-DCLC-CRW   Document 1-1   Filed 05/23/19   Page 35 of 44   PageID #: 49

The Lease also grants to Lessee an Option to purchase the property which is the subject of the Lease on the terms and conditions specified therein.

IT IS UNDERSTOOD AND AGREED that this is a Memorandum of Lease which is for the rents and upon the terms, covenants and conditions contained in the aforesaid Lease executed by the parties hereto and bearing even date herewith, which collateral Lease agreement is and shall be a part of this instrument as fully and completely as if the same were set forth herein.

IN WITNESS WHEREOF, the LESSOR and LESSEE have caused this instrument to be executed as of the day and year first above written.

Landlord:

BRISTOL PRESERVATION, LLC

By: _____

Print: _____S. MITCHELL WALTERS_____

Title: _____

Tenant:

NAUTILUS FITNESS CENTER, INC.

By: _____

Print: _____Donald Bradford_____

Title: _____President_____

- 2 -

Case 2:19-cv-00084-DCLC-CRW   Document 1-1   Filed 05/23/19   Page 36 of 44   PageID #: 50

STATE OF TENNESSEE )
)
COUNTY OF WASHINGTON )

Before me, Rick J. Bearfield, a Notary Public of the state and county aforesaid, personally appeared Donald F. Bradford, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself to be President of Nautilus Fitness Center, Inc., the within named bargainor, a corporation, and that he as such President being authorized so to do, executed the foregoing instrument for the purpose therein contained, by signing the name of the corporation by himself as President.

Witness my hand and seal, at office this 28 day of September, 2015.

My Commission Expires:

MY COMMISSION EXPIRES
DECEMBER 01, 2015

STATE OF Tennessee )
)
COUNTY OF Sullivan )

Before me, Crissy Bebber a Notary Public of the state and county aforesaid, personally appeared Mitch Walters with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged himself to be Manager of Bristol Preservation, LLC, the within named bargainor, a limited liability company, and that he as such Manager being authorized so to do, executed the foregoing instrument for the purpose therein contained, by signing the name of the limited liability company by himself as Manager.

Witness my hand and seal, at office this 29th day of September, 2015.

Crissy Bebber
NOTARY PUBLIC

My Commission Expires:

April 1, 2019

MEML9215RL.006_9.28.2015.docx

- 3 -



Exhibit "A"

## EXHIBIT E

### SECOND PHASE INTERIOR IMPROVEMENTS

Cause the kitchen, kitchen equipment, dining room, bar, and bar equipment, to be cleaned (including carpets, as may be applicable), and fully operational for immediate use by Tenant.

Replace the ceiling above the kitchen located on the lower level of the Clubhouse.

Cause the showers and bathrooms in the Clubhouse locker rooms to be operational for immediate use by Tenant.

Install a drain under the ice machine in the lower level.

## EXHIBIT F

### THIRD PHASE INTERIOR IMPROVEMENTS

Install a new glass entry door to the Clubhouse.

Clean and renovate the Clubhouse lobby and bathroom, and cause same to be ADA compliant.

Replace the lobby ceiling and install lighting and fixtures.*

Replace the wallpaper in the Clubhouse lobby.*

Paint the Clubhouse hallways.*

Replace the flooring in the Clubhouse lobby.*

Erect a temporary wall to separate the Clubhouse lobby from the ballroom.

Repair or replace the HVAC for the main level of the Clubhouse so that the HVAC is in good worker order in Tenant's reasonable discretion.

Remediate the air quality of the main level of the Clubhouse to the extent such remediation is necessary, in Tenant's reasonable discretion, pursuant to an air quality test to be performed by Landlord at Landlord's cost and expense.

* Pursuant to and in accordance with Section 7(c) of the Lease, Tenant shall repay Landlord for the cost of those Third Phase Interior Improvements identified above by an asterisk. In addition, Tenant shall have the exclusive right to select the materials for the Third Phase Interior Improvements identified above by an asterisk.

## EXHIBIT G

## EXTERIOR IMPROVEMENTS

Remove and replace the stone veneer located at front exterior of the Clubhouse.

Wrap front exterior columns with wood column design.

Repair and/or replace entrance canopy.

Install new clapboard siding.

Paint exterior walls, siding, facia, and stairs.

Repair or replace rear steel balcony of Clubhouse to remedy any existing condition that makes the rear steel balcony hazardous or not able to be used due to safety concerns.

## EXHIBIT H

## ENCUMBRANCES

1.      That certain Deed of Trust among Bristol Preservation, LLC as grantor and Renasant Bank as lender/beneficiary, of record in Book 3163, page 2183, in the Office of the Register of Deeds for Sullivan County, Tennessee;

2.      That certain Assignment of Rents between Bristol Preservation, LLC as grantor and Renasant Bank as lender, of record in Book 3163, page 2195, in the Office of the Register of Deeds for Sullivan County, Tennessee;

3.      To the extent it pertains to any portion of the Leased Premises, that certain Memorandum of Lease of record in Book 3175, page 1879, in the Office of the Register of Deeds for Sullivan County, Tennessee, a copy of which being attached hereto, pertaining to the Excluded Property and the lease related thereto;

4.      All matters shown on Schedule B to the Owners Policy of Title Insurance attached hereto; and

5.      Any other title matter disclosed to Tenant in writing by Landlord.

# INVESTORS TITLE INSURANCE COMPANY

P.O. Drawer 2687
Chapel Hill, North Carolina 27515-2687

Policy No. 201501508TN

## SCHEDULE B
### *EXCEPTIONS FROM COVERAGE*

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

I.  The dower, curtesy, homestead, community property, or other statutory marital rights, if any, of the spouse of any individual insured.

1.  *Taxes for the year 2015, and subsequent years, not yet due and payable.*

2.  *Easements to Bristol Tennessee Electric and Inter-Mountain Telephone recorded in Deed Book 109 at Page 445 and Deed Book 84 at Page 542.*

3.  *Easement to Inter-Mountain Telephone recorded in Deed Book 111 at Page 337.*

4.  *Sewer easements to the City of Bristol recorded in Deed Book 319 at Page 148; Deed Book 260 at Page 490; Deed Book 601 at Page 560; and Deed Book 234 at Page 68.*

5.  *Right of way easement recorded in Deed Book 319 at Page 816.*

6.  *General utility easements to Bristol Tennessee Electric recorded in Deed Book 437 at Page 644, Deed Book 84 at Page 542 and Deed Book 84 at Page 544.*

7.  *Right of way agreement recorded in Deed Book 167 at Page 532.*

8.  *Maintenance agreement for fence recorded in Deed Book 115 at Page 335.*

9.  *Water right of way and TVA transmission line easement recorded in Deed Book 80 at Page 405.*

10. *Utility easement to City of Bristol recorded in Deed Book 195 at Page 661.*

11. *Water Line easement adjacent to Jonesborough Road as referred to in Deed Book 135 at*

*Form No. 109-06-A*

*Page 7*

Policy No. 201501508TN

*Page 434 and Deed Book 435 at Page 506.*

*12.    Subject to matters shown on recorded plat in Plat Book 1 at Page 210; Plat Book 2 at Page 210; Plat Book 9 at Page 74; and Plat Book 54 at Page 305.*

*13.    Easement Agreement dated October 17, 2007, of record in Book 707 at Page 427, between CCOB, LLC, and Bristol Tennessee Essential Services.*

*14.    Rights of other in and to Monroe Drive as set forth Declaration of Private Access, Maintenance and Utilities Easements made by CCOB, LLC, dated December 8, 2008, and recorded in Book 737 at Page 232.*

*15.    The Fairway Drive Tract is subject to rights of ingress and egress granted by the Country Club of Bristol, a predecessor in title, to the owners of the lots in Country Club Subdivision abutting Fairway Drive.*

*16.    Easement Agreement for driveway encroachment dated March 17, 2010, between CCOB, LLC, and Kurt D. and Norman J. Kost, of record in Book 765 at Page 133.*

*17.    Title to all minerals within and underlying the Land, together with all mining rights and other rights, privileges and immunities relating thereto.*

*18.    Rights or claims of parties in possession not shown by the public records.*

*19.    Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land.    The term "encroachment" includes encroachments of existing improvements located in the Land onto adjoining land, and encroachments onto the Land of existing improvements located onto adjoining.    Paragraph 2 (c) of the Covered Risks is hereby deleted.*

*20.    Restrictions appearing of record in Misc. Book 1 at Page 427 and modified in Miscellaneous Book 2 at Page 232; Amendment to Declaration of Restrictions of record in Book 700 at Page 283, but this policy insures that a violation thereof will not cause a forfeiture or reversion of Title.*

*21.    Any inaccuracy in the area, square footage, or acreage of Land described in Schedule A*