IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| KOVA BRISTOL TENN 1894, LLC, ) <br> A Florida Limited Liability Company, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BRISTOL PRESERVATION, LLC, ) <br> A Tennessee Limited Liability Company, ) <br> ) <br> Defendant. ) | Docket No. 2:19-cv-00084 |

**BRISTOL PRESERVATION, LLC'S POST-HEARING BRIEF**

Defendant and Counter-Plaintiff, Bristol Preservation, LLC ("Bristol Preservation"), pursuant to this Court's Minutes of Proceedings [Doc. 26], respectfully submits the following post-hearing brief. Bristol Preservation would show as follows:

**I.    KOVA failed to perform its obligations under the lease.**

KOVA Bristol Tenn 1894, LLC ("KOVA") breached its Lease with Bristol Preservation by failing to pay taxes it agreed to pay. (October 17, 2019, Hearing Transcript ("Transcript"), 25:22-26:4, 178:10-12, Ex. 1, ¶ 12).[1] The Sullivan County taxes for 2018 for $13,230 were due on February 28, 2019. (Transcript, 26:8-16, Ex. 3). The City of Bristol taxes for 2018 for $11,213 were due on January 7, 2019. (Transcript, 26:17-19, Ex. 3). Despite repeated demands, KOVA failed to pay these taxes. (Transcript, 26:21-27:4, 178:13-179:11). While KOVA argued that taxes

---

[1] Mitch Walters ("Mr. Walters"), a principal of Bristol Preservation, testified that taxes were to be paid monthly. (Transcript, 84:4-7). Because the Lease is unclear on how taxes were to be paid, Mr. Walters referenced the initial term sheet provided by KOVA, which stated that "KOVA [was] to pay a monthly reimbursement, to Bristol Preservation (Lessor), for amortized state and local real estate taxes for the leased property." (Transcript, 106:21-108:11, Ex. 1, ¶ 12, Ex. 17).

abated because of Bristol Preservation's actions, there is not a single provision in the Lease allowing KOVA to stop paying taxes. (Transcript, Ex. 1); [Doc. 20, PageID # 261; Doc. 31, PageID # 949].

KOVA continues to argue that Bristol Preservation is attempting to collect taxes for property not leased by KOVA. [*See, e.g.,* Doc. 31, PageID # 949]. This is incorrect. On December 31, 2018, Bristol Preservation paid the City of Bristol taxes for the leased property and the taxes for the fitness center. (Copies of Checks, **Exhibit A**; Transcript, 26:21-27:4, 38:5-6). Likewise, on February 25, 2019, Bristol Preservation mailed one joint payment for the Sullivan County taxes for the leased property and the fitness center. (*Id.*). At this juncture, Bristol Preservation is simply asking for the repossession of its property based on KOVA's breach. [*See generally* Doc. 18]; (Transcript, 48:22-49:11). At the final trial of this matter, this Court may assess the precise amount owed to Bristol Preservation for taxes. Nevertheless, it is sufficient to note that KOVA has paid no taxes, period. (Transcript, 26:21-27:4, 178:13-179:11).

Likewise, KOVA breached the Lease agreement by failing to pay rent. (Transcript, 21:25-23:20, 178:13-21, Ex. 1, ¶ 5, Ex. 2). KOVA's Fixed Rent obligation of $6,250 per month began on June 1, 2018. (Transcript, 21:21-24, Ex. 1, ¶ 5(a)). KOVA has made a total of three Fixed Rent payments (one was a partial payment), and those payments were for the months of September, October, and November 2018. (Transcript, 21:25-23:20, Ex. 2). KOVA has made no additional Fixed Rent payments. (Transcript, 45:6-12, Ex. 2). KOVA was also required to pay Monthly Percentage Rent beginning on May 1, 2018, and Food and Beverage Rent beginning on April 1, 2018. (Transcript, 21:25-23:20, Ex. 1, ¶ 5(b), (c)). KOVA has never provided any documents showing its gross revenue, but there is no dispute that KOVA has never made more than one percentage rent payment. (Transcript, 23:16-24:2, 24:19-25:21, Ex. 2).

KOVA argues that the rent commencement date was extended until August 2018, when it obtained its restaurant license. (Transcript, 90:7-10); [Doc. 20, PageID # 260; Doc. 31, PageID # 950]. Even if true, this does not explain why KOVA stopped paying all Fixed Rent after November 2018 or why it has not made any percentage rent payments (excepting for November 2018). (Transcript, Ex. 2).

KOVA also argues that rent abated because of Bristol Preservation's alleged failure to perform work in a timely manner. [Doc. 20, PageID ## 259-60; Doc. 31, PageID ## 947-51]. As discussed below, Bristol Preservation cannot be held responsible for KOVA's failure to act in good faith in approving work. (*See infra* Secs. II, III). Most importantly, KOVA's interpretation of abatement is harsh and strained.[2] [Doc. 31, PageID ## 947-51]. KOVA would read the abatement provision as simply allowing it to stop performing all of its rental obligations under the Lease. [*Id.*]. The only reasonable interpretation of the abatement provision, however, would require reading abatement in conjunction with the Lease as a whole and the remedies provisions specifically. (*See infra* Sec. III). Read together, the abatement and remedies provisions only allow KOVA, in the event of Bristol Preservation's default, to (1) terminate the Lease or (2) procure the services Bristol Preservation failed to perform and deduct that amount from the rent owed. (Transcript, Ex. 1, ¶¶ 7(f), 8(a)(ii), (22)). KOVA has done neither.

Finally, KOVA breached the Lease by failing to operate the Country Club in a competent and professional manner. (Transcript, 46:14-47:24, Ex. 1, ¶ 9). KOVA has too few and inexperienced employees operating the Country Club, until recently was without a golf pro, has

---

[2] KOVA's interpretation is also violative of the express terms of the Lease, as not all rent would be abated: "Rent" is defined as Fixed Rent and Monthly Percentage Rent. (Transcript, Ex. 1, ¶ 5(b)). Food and Beverage Rent is conspicuously absent from the definition of "Rent." (Transcript, Ex. 1, ¶ 5(b)). In the event of Bristol Preservation's default, which Bristol Preservation adamantly denies, only "Rent" was abated. (Transcript, Ex. 1, ¶ 7(c), (d)). KOVA does not dispute that it sold food and beverages, and in no situation should KOVA be excused from paying Food and Beverage Rent. (Transcript, 147:16-17, 191:12-14, Ex. 1, ¶¶ 5(b), 7(c), (d)).

done nothing to maintain the landscaping around the clubhouse, and does not pay its bills. (Transcript, 46:14-47:24, 191:12-193:24, Ex. 28). In apparent response, KOVA introduced several pictures of the golf course. (Transcript, 162:25-164:21, Ex. 26). Bristol Preservation does not dispute that the golf course itself has been maintained competently—though KOVA has failed to pay the 2018 aeration bill and, consequently, failed to aerate the greens for 2019. (Aerification Invoice attached as **Exhibit B**; Transcript, 46:9-47:24, 194:10-195:12). While KOVA benefitted by inheriting a well-kept golf course and an exceptional groundskeeper, the fact remains that the employees are unexperienced, the golf pro position has been vacant, the landscaping is grim, and vendors are unpaid. (Transcript, 46:14-47:24, 191:12-193:24, Ex. 28). The condition of the golf course notwithstanding, KOVA has breached the Lease for its failure to operate the Country Club in a competent and professional manner, not the golf course. (Transcript, Ex. 1, ¶ 9).

## II. Bristol Preservation performed its work and was ready, willing, and able to complete additional work.

The Lease provided four phases of work to be completed by Bristol Preservation: Landlord's Initial Work, Second Phase Interior Improvements, Third Phase Interior Improvements, and Exterior Improvements.[3] (Transcript, Ex. 1, ¶ 7). KOVA admits that Bristol Preservation completed Landlord's Initial Work and Second Phase Interior Improvements, which is consistent with KOVA's commencement of rent payments in the fall of 2018. [Doc. 20, PageID # 264; Doc. 31, PageID # 950]; (Transcript, 139:21-24). While Bristol Preservation was ready, willing, and able to commence the Third Phase Interior Improvements and Exterior Improvements, KOVA did not approve any renderings from contractors for these phases of work. (Transcript, 32:1-3, 80:17-21, 106:5-16, 112:24-113:1, 117:11-17, 165:25-166:1, 168:3-169:14).

---

[3] The Lease also provided for Main Level Renovations. (Transcript, Ex. 1, ¶ 7(e)). KOVA was required to provide "architectural, engineering, and design plans, along with a cost estimate," by December 31, 2018, but it failed to provide these plans. (Transcript, 182:13-21, Ex. 1, ¶ 7(e)).

Prior to execution of the Lease, Bristol Preservation recommended that KOVA contract with J.A. Street and Associates ("JASA") or BurWil Contractors to perform work at the Country Club. (Transcript, 31:5-8). KOVA chose to proceed with JASA. (Transcript, 31:9-16). Bristol Preservation continually represented to KOVA that it would complete a scope of work that "Mr. Anthony Emma and Mr. Rick Rainville [principals of KOVA] wanted done" and that it would "pay for the work once [it] had direction and the scope of work was defined." (Transcript, 81:2-6). This was consistent with the Lease, which stated that all work was to be completed "to Tenant's reasonable satisfaction" and obligated KOVA to share in the cost of the work. (Transcript, 169:9-14, 181:23-182:2, Ex. 1, ¶ 7). Thus, from the beginning of the Lease, KOVA maintained direct contact with JASA and Bristol Preservation simply signed off on work and paid JASA, among others, for the completed work. (Transcript, Ex. 1, 31:2-32:7, 80:24-81:9).

KOVA attempted to paint a picture that Bristol Preservation notified JASA to stop work. (Transcript, 145:20-22, 146:5-11). Excepting the work Bristol Preservation was required to perform, KOVA was responsible for all other work. (Transcript, Ex. 1, ¶ 8). On several occasions, KOVA requested that JASA perform work that Bristol Preservation was not required to perform. (Transcript, 72:5-8). In fact, JASA's agent requested clarification on the scope. (Transcript, 95:17-98:13, 104:21-24). Accordingly, Bristol Preservation informed JASA that JASA needed to be clear on who was responsible for work JASA completed—"And that's why I wrote the email to clarify, to delineate between what he's supposed to do that we agreed to do, and anything else that KOVA asked him to do would be an agreement that JASA would have with . . . KOVA. *So it is a simple clarification.*" (Transcript, 103:16-104:5, 104:21-106:16) (emphasis added). Bristol Preservation never requested that JASA stop work. (Transcript, 95:17-98:13, 103:16-104:5, 104:21-106:16).

That Bristol Preservation never requested JASA to stop working is evidenced by the fact that several weeks after Bristol Preservation emailed JASA clarifying the scope of work, JASA sent a proposal for a scope of work. (Transcript, 106:5-16, 112:20-113:1, Ex. 5). Bristol Preservation was ready to proceed, but KOVA did not approve this scope of work. (Transcript, 106:5-16, 112:20-113:1, 117:6-16, 165:25-166:1, 168:7-10). Instead, without Bristol Preservation's knowledge, KOVA waited two months to contact BurWil to provide renderings and a proposal for Third Phase Interior Improvements and Exterior Improvements. (Transcript, 113:2-7, 117:17-20, 126:19-127:11, Ex. 21). Again, Bristol Preservation was ready, willing, and able to perform this work, but KOVA had stopped paying rent and refused to pay taxes. (Transcript, 38:7-15, 43:18-44:4, Ex. 36). In fact, Bristol Preservation communicated with KOVA and BurWil for over a month that it was ready to proceed with the work if KOVA would simply pay rent and taxes, as required by the Lease. (*Id.*). KOVA refused. (Transcript, 208:4-22).

### III. KOVA did not pursue the remedies available to it under the Lease.

KOVA claimed that Bristol Preservation breached the Lease for failure to perform work. [Doc. 31, PageID ## 947-49]. As such, KOVA claims that it is entitled to simply stop paying rent and never pay taxes. [*Id.*]. The Lease, however, does not allow for that. (*See generally* Transcript, Ex. 1).

Lease Paragraph 22 provides for KOVA's remedies in the event Bristol Preservation defaults under the Lease. (Transcript, Ex. 1, ¶ 22). After giving notice and Bristol Preservation at least a 30 day period to cure, KOVA may (1) "terminate this Lease" or (2) "make such payment as Landlord's agent or perform any such term, provision, covenant or condition, and the full amount of the cost and expense entailed in curing Landlord's default . . . shall immediately be paid by Landlord to Tenant." (*Id.*). Without giving notice or an opportunity to cure, KOVA simply stopped paying rent and failed to pay taxes. (Transcript, Ex. 16; *see supra* Sec. I). KOVA did not

terminate the Lease or complete the Third Phase Interior Improvements or Exterior Improvements and seek reimbursement from Bristol Preservation. (Transcript, 48:12-21, 184:25-185:3, 187:19-188:21, 189:15-17, Ex. 16).

Similarly, Lease Paragraph 8(a)(ii) provides remedies for Bristol Preservation's failure to complete "Capital Improvements," which KOVA admitted included Third Phase Interior Improvements and Exterior Improvements. (Transcript, Ex. 1, ¶ 8(a)(ii)). Mr. Rainville testified that the "third phase[] interior improvements, the exterior improvements, the renovation plans" were "[c]apital improvements as opposed to maintenance issues." (Transcript, 187:2-11). Again, KOVA could terminate the Lease, which it has not done, or KOVA could "complete the improvements," amortize the cost over 240 months, and reduce Rent—i.e., Fixed Rent and Monthly Percentage Rent, not Food and Beverage Rent—by the amortized amount, consistent with the abatement provision that KOVA seems to rely on. (Transcript, Ex. 1, ¶¶ 5(b), 8(a)(ii)). KOVA has pursued neither remedy. (Transcript, 48:12-21, 184:25-185:3, 187:19-188:21, 189:15-17, Ex. 16).

KOVA simply reads these remedy provisions out of the Lease by focusing on two clauses that provide that if Third Phase Interior Improvements and Exterior Improvements were not completed, "then all Rent shall abate until . . . completed." (Transcript, Ex. 1, ¶ 7(c),(d)); [Doc. 31, PageID ## 947-49]. Reading these clauses in conjunction with the aforesaid Lease provisions, which is how the Lease must be interpreted, rent abatement must be read as allowing KOVA to complete the improvements and deduct the cost from the rent owed, as stated in Paragraphs 8(a)(ii) and 22. (Transcript, Ex. 1, ¶¶ 8(a)(ii), 22); *Perkins v. Metropolitan Gov't of Nashville*, 380 S.W.3d 73, 85 (Tenn. 2012) ("Contract provisions are not read in isolation, however. Rather, courts must construe contracts as a whole and ascertain the parties' intent from the 'usual, natural, and ordinary

meaning of the contractual language.'"). Even if KOVA truly could stop paying Rent—not to mention taxes, which never abates in the Lease—"Rent" is a defined term that does not include Food and Beverage Rent. (Transcript, Ex. 1, ¶ 5(b)). Indisputably, KOVA has never paid Food and Beverage Rent, despite acknowledging it has generated revenue from food and beverage sales. (Transcript, 147:16-17, 191:12-14, Ex. 1, ¶¶ 5(b), 7(c), (d)).

In short, KOVA attempts to fault Bristol Preservation for failing to complete hundreds of thousands of dollars of work without KOVA's approval, yet KOVA has not pursued the remedies provided for in the Lease, but rather squatted on Bristol Preservation's property and proposes to continue to do so for an indefinite period of time. KOVA's breach has effectively caused the Lease to terminate, and Bristol Preservation should be restored to possession of its property.

### IV. Rick Rainville's testimony was inconsistent and not credible.

KOVA called two witnesses—William Prince, principal of BurWil, and Rick Rainville, principal of KOVA. Mr. Prince testified that Bristol Preservation was ready, willing, and able to proceed with BurWil's proposed scope of work and that Mr. Walters is "a great man," maintains a "very high" reputation in the community, is a man of honor and integrity, and truthful. (Transcript, 123:22-124:13, 127:20-128:4). Accordingly, it fell to Mr. Rainville to support KOVA's position. His testimony, however, was inconsistent with the Lease, as described above, and contradicted by other evidence, destroying the credibility of his testimony.

Mr. Rainville testified that KOVA provided comments on the JASA proposal but did not hear anything from JASA or Bristol Preservation. (Transcript, 166:2-11). KOVA never introduced any exhibits documenting these comments. (Transcript, 168:3-11). On the other hand, Mr. Walters testified, consistent with the exhibits introduced, that he was happy with the proposal and ready, willing, and able to proceed with the JASA proposal. (Transcript, 32:1-10, 106:12-16). Even more revealing is an earlier May 2018 proposal from JASA, which was provided to Bristol

Preservation in response to a subpoena to JASA days before the hearing. (**Exhibit C**). JASA noted on the proposal that "None of this was approved by Tennant [sic]." (*Id.*). Despite Mr. Rainville's testimony, the record does not support the contention that KOVA approved plans from JASA. (Transcript, 168:7-11 ("So you did not make comments about this estimate and you certainly did not accept this proposal, did you? We didn't reject it.")).

Likewise, Mr. Rainville was asked a series of questions in which his only real answer was that the witness or document was not true. When asked about Country Club member Larry Talbert's sworn affidavit, Mr. Rainville stated that nearly all of Mr. Talbert's testimony was untrue. (Transcript, 191:7-192:22, Ex. 28). When asked about KOVA's unpaid bills with JASA, Mr. Rainville's only explanation was that he had never received the invoices, in direct contradiction to the document, or that KOVA simply did not owe the amounts charged. (Transcript, 191:7-192:22, 196:4-197:4, 197:17-198:4, Exs. 28-30; Exhibit B). When asked about his prior criminal convictions, Mr. Rainville was evasive, stating he had none besides his vehicular homicide conviction. (Transcript, 202:5-18). This statement was false; Mr. Rainville has had several other criminal matters. (Transcript 202:19-203:11, Exs. 32-33). Taken together, Mr. Rainville's credibility is, at best, questionable; rather than admit that he was wrong, Mr. Rainville testified that all those facts that contradicted his testimony were false.

This pattern of misrepresentation was consistent with his vehicular homicide conviction. In 2003, at approximately 7:51 A.M., Mr. Rainville was arrested for driving while intoxicated and killing a passenger in another vehicle. (Transcript, Ex. 31). At the scene of the crime, witnesses saw Mr. Rainville attempting to dispose of beer cans. (*Id.*). Mr. Rainville's blood alcohol content was 0.187, yet, unsurprisingly, Mr. Rainville testified at the evidentiary hearing that this was incorrect. (Transcript, 200:18-201:8, Ex. 31). Mr. Rainville eventually pled no contest to the

charges and was only released from probation in 2019.[4] (Transcript, 201:7-8; Nolo Contendre, **Exhibit D**).

Perhaps KOVA's failures were the result of Mr. Rainville's inexperience running a country club. Mr. Rainville began his career as a bartender. (Transcript, 170:4-10). After that, he worked for several golf clubs as an assistant to the golf pro, taking "care of the golf carts, check[ing] people in," etc. (Transcript, 170:11-22). He then worked as a golf pro for several years before not being retained after a change in management. (Transcript, 170:23-172:1). Thereafter, Mr. Rainville formed KOVA Golf Management with Anthony Emma. (Transcript, 172:4-5). Since forming KOVA in 2016, KOVA boasts of only one golf club under management—the Country Club of Bristol. (Transcript, 172:19-22). KOVA has actively litigated against two of its golf clubs, one of which, Myakka Pines, was never under contract,[5] and has only provided consulting services to several other golf courses. (Transcript, 172:19-174:20).

In sum, Mr. Rainville lacks credibility. He, and KOVA, have no real golf course management experience. Mr. Rainville repeatedly failed to deal with Bristol Preservation in good faith during the term of the Lease, and his testimony at the hearing was undermined by other credible evidence. In assessing the credibility of the witnesses, the Court should give little, if any, weight to Mr. Rainville's testimony.

---

[4] This Court, consistent with the Sixth Circuit, has held that the 10-year limitation for criminal conviction impeachments under Rule 609 is triggered when probation is terminated. *U.S. v. Wood*, No. 3:08-CR-26, 2008 WL 5094888, at *5 (E.D. Tenn. Nov. 25, 2008) (*citing U.S. v. Gaines*, 105 Fed. Appx. 682, 695 (6th Cir. 2004), *vacated on other grounds*, *Gaines v. U.S.*, 543 U.S. 1114 (2005)). In this case, probation was terminated in 2019.

[5] Mr. Rainville only conceded that KOVA did not have a contract with Myakka Pines after being impeached with his deposition in the lawsuit against Myakka Pines in which he admitted KOVA had no contract, oral or written, with Myakka Pines. (Transcript, 175:4-177:5).

## V. Mr. Walter's testimony was credible.

On the other hand, Mr. Walter's testimony was credible and consistent with the record. While Mr. Rainville failed to support his allegation that KOVA communicated with JASA to obtain renderings that satisfied both KOVA and Bristol Preservation, Mr. Walters, consistent with the documentary evidence, explained that this was not true. Bristol Preservation was ready, willing, and able to proceed with the Third Phase Interior Improvements and Exterior Improvements, JASA and BurWil acknowledged that readiness, yet KOVA would not sign off on the scope of work. (Transcript, 106:5-16, 123:22-124:13, 127:20-128:4, 208:4-22, Exs. 5, 21, 36). Similarly, Mr. Walters testimony was consistent with Mr. Talbert, both of whom testified that while the golf course was in good condition—primarily because of Bristol Preservation's pre-Lease efforts—the landscaping for the Country Club and Country Club operations were dismissal. (Transcript, 46:9-27:24, 191:7-192:22, 194:10-195:12, Ex. 28). Mr. Prince, KOVA's first witness, said it best: Mr. Walters is "a great man," maintains a "very high" reputation in the community, is a man of honor and integrity, and truthful.[6] (Transcript, 123:22-124:13, 127:20-128:4). This Court should give Mr. Walters's testimony great weight.

---

[6] Consistent with this testimony, Mr. Walters, along with Roscoe Bowman, attempted to resolve the issues resulting from KOVA's breaches of the Lease prior to litigation. [Doc. 18, PageID ## 137-38, ¶ 33]. After KOVA's actions effectively terminated the Lease, Bristol Preservation paid KOVA's bills in an attempt to secure a mutually beneficial settlement. [*Id.*]. All these actions were to no avail, as KOVA consistently acted in bad faith and failed to meet with Bristol Preservation.

## VI. Conclusion

KOVA breached the Lease by failing to pay taxes and rent and failing to operate the Country Club in a professional and competent manner. Under Lease Paragraph 21, Bristol Preservation is entitled to terminate the Lease. Thus, Bristol Preservation requests that this Court:

1. Enter a judgment for possession of the Country Club, pursuant to Tennessee Code Annotated Section 29-18-104.

2. Order that the clerk issue a writ of possession, as allowed by Federal Rule of Civil Procedure 70, against KOVA for the Country Club, which is more particularly described as the Leased Premises in the Lease, if KOVA does not vacate the Country Club within ten days after entry of the judgment.

3. Reserve all monetary damages resulting from KOVA's material breaches for the final hearing of this matter, which is currently scheduled for August 2020.

Respectfully submitted this 12th day of November, 2019.

**PAINE, TARWATER, and BICKERS, LLP**

/s Dwight E. Tarwater
Dwight E. Tarwater (BPR #007244)
det@painetarwater.com
Adam R. Duggan (BPR #035121)
ard@painetarwater.com
900 South Gay Street, Suite 2200
Knoxville, Tennessee 37902
865-525-0880

**THE ISAACS LAW FIRM**

/s Gregory Isaacs
Gregory Isaacs (BPR #013282)
gpi@isaacslawfirm.com
618 South Gay Street, Suite 300
Knoxville, Tennessee 37902
865-673-4953

*Counsel for Defendant Bristol Preservation, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of November, 2019, the foregoing was served on the following via the Court's electronic filing system:

William A. Reeves
Lindsey L. Hobbs
WISE & REEVES, PLLC
Two Centre Square, Ste. 160
625 S. Gay Street
Knoxville, TN 37902

/s Dwight E. Tarwater