KOVA BRISTOL TENN 1894, LLC, a Florida )
Limited Liability Company, )
)
        Plaintiff, )
)
v. )      No. 2:19-CV-84-DCLC-CRW
)
BRISTOL PRESERVATION, LLC, a Tennessee )
Limited Liability Company, )
)
        Defendant. )

## REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the referral Order [Doc. 24] of the District Judge.[1]

Now before the Court is Defendant's Motion for Judgment for Possession [Doc. 15]. The parties appeared before the Court on October 17, 2019. Attorneys William Reeves and Lindsey Lovingood Hobbs appeared on behalf of Plaintiff. Attorneys Adam Duggan, Gregory Isaacs, and Dwight Tarwater appeared on behalf of Defendant. The parties also filed post-hearing briefs [Docs. 31 and 32], which the Court has considered. Accordingly, for the reasons more fully set forth below, the Court hereby **RECOMMENDS** that Defendant's Motion [**Doc. 15**] be **GRANTED**.

## I.    BACKGROUND

The lawsuit involves disputes over a lease agreement for real property in Sullivan County, Tennessee. [Doc. 1]. Specifically, the Complaint states that Plaintiff entered into a lease agreement ("Lease Agreement") with Defendant, consisting of a golf course, clubhouse, and

---

[1] The undersigned was assigned to this case given the vacancy of the magistrate judge position in Greeneville, Tennessee. After the undersigned conducted the motion and evidentiary hearing, the case was reassigned to United States Magistrate Judge Wyrick.

management facility ("Property"). [*Id.* at ¶ 9]. The Complaint alleges that pursuant to the terms of the Lease Agreement, Defendant was required to deliver the Property to Plaintiff on April 1, 2018, in operating condition to be immediately opened for business, other than the work that Defendant would perform as outlined in the Lease Agreement. [*Id.* at ¶ 12].

Specifically, Defendant was required to perform work in certain phases: (1) the Second Phase Interior Improvements were due by April 30, 2018; (2) the Third Phase Interior Improvements were due by June 30, 2018; (3) the Exterior Improvements were due by July 30, 2018; and (4) work on the main level of the clubhouse ("Main Level Restorations") was to commence by February 1, 2019. [*Id.* at ¶¶ 21-22, 25, 28].

The Complaint states that according to the Lease Agreement, Plaintiff was required to pay a monthly fixed rent in the amount of $6,250, beginning on June 1, 2018. [*Id.* at ¶ 18]. In addition, Plaintiff was required to pay a monthly percentage rent based on the revenue it received from the golf course and food and beverage sales. [*Id.* at ¶ 19]. The Complaint avers that pursuant to the Lease Agreement, if the Third Phase Interior Improvements or Exterior Improvements were not completed by the deadlines set forth above, then all rent would abate until such improvements were completed. [*Id.* at ¶¶ 24, 27]. Further, with respect to the Main Level Renovations, the Lease Agreement states that the monthly fixed rent and monthly percentage rent per calendar month shall not be in excess of $10,000, until the Main Level Renovations are completed. [*Id.* at ¶ 32].

The Complaint alleges that Defendant failed to complete the Second Phase Interior Improvements, the Third Phase Interior Improvements, and the Exterior Improvements by the deadlines. [*Id.* at ¶¶ 53-58]. With respect to the Main Level Renovations, the Complaint states that as of May 23, 2019, the main level of the clubhouse remains demolished. [*Id.* at ¶ 59]. Plaintiff alleges breach of contract, fraudulent misrepresentation, breach of the convenient of quiet enjoyment, and tortious interference with business relationships.

2

## II.    SUMMARY OF THE TESTIMONY

During the October 17 motion hearing, the Court heard testimony and received exhibits from both parties.  The Court has provided a summary below.

### A.    Steven Mitchell Walters

Steven Mitchell Walters ("Walters") is one of Defendant's owners.  [Doc. 29 at 16]. Walters testified that Bristol Preservation, LLC was formed to purchase the assets of the Country Club of Bristol.  [*Id.*].  He and Roscoe Bowman ("Bowman") own the company.  [*Id.*].

Walters testified that Defendant entered into the Lease Agreement [Ex. 1] with Plaintiff on April 10, 2018.  [*Id.* at 18, 20].  Walters stated that there are three different provisions for the payment of rent: (1) fixed rent, (2) monthly percentage rent, and (3) food and beverage percentage rent.  [*Id.* at 21].  Fixed rent is $6,250 per month, or $75,000 per year.  [*Id.* at 21].  Walters testified that since April 2018, Plaintiff has only paid three-months' rent or $17,500.  [*Id.* at 21-22, 23]. Walters stated that the rent he did receive was past due.  [*Id.* at 23].

Walters testified that with respect to monthly percentage rent, Defendant was entitled to 5% of the revenues that Plaintiff took in from operations, including green fees, cart rental, food and beverage, and selling merchandise.  [*Id.* at 24].  The monthly percentage was capped at a combined aggregate total of $10,000, so that the minimum rent that Defendant would receive would be $6,250, and the maximum rent Defendant could receive was $10,000.  [*Id.*].  Walters testified that Defendant received $3,750, but there was no explanation given as to what this amount was toward.  [*Id.*].  He stated that the 5% of revenues was supposed to be paid from inception.  [*Id.* at 25].  He explained that Defendant forgave the base rent for three months so that Plaintiff could get started, but the 5% of revenues was not forgiven.  [*Id.*].

Walters testified that according to the Lease Agreement, Plaintiff was supposed to pay the tax bills. [*Id.* at 26]. He stated that the county taxes for 2018 were $13,230 and that the city taxes were $11,213 for 2018. [*Id.* at 26]. Walters testified that Defendant paid those taxes and that Plaintiff was supposed to reimburse Defendant immediately upon payment, but after multiple requests, Plaintiff has still not paid Defendant. [*Id.*].

Walters testified that pursuant to the Lease Agreement, Defendant was obligated to perform work on the Property. [*Id.* at 27]. With respect to the initial work, Walters claimed that Defendant "went overboard." [*Id.*]. For instance, he stated that Defendant was required to clean certain items (i.e., carpet and tiles), but instead, Defendant replaced them. [*Id.* at 27-28]. After the initial work was completed, a Certificate of Occupancy was obtained on July 13, 2018; however, Walters explained that the club was operational the whole time. [*Id.* at 29]. Walters testified that he was prepared to move forward with the Exterior Improvements and with the Main Level Restorations. [*Id.* at 30].

Walters testified that J.A. Street & Associates ("JASA") performed a preliminary estimate for work that was provided to Plaintiff to renovate the county club. [*Id.* at 30]. He stated that all of a sudden, Plaintiff went silent with JASA and never finalized the plans. [*Id.* at 31]. Walters stated that nothing happened with JASA's estimate because it was not approved by Plaintiff. [*Id.* at 32]. Walters testified that pursuant to the Lease Agreement, Plaintiff controlled the design and that Plaintiff needed to be satisfied with the projects. [*Id.*]. Plaintiff was required to participate to some degree in the renovations, except the first two phases, which was left to Defendant's discretion. [*Id.* at 33].

Walters testified that on December 7, 2018, he was told that Plaintiff had solicited design quotes and drawings from BurWil Construction ("BurWil"). [*Id.* at 34]. Later, Walters had a conversation with Bowman, Anthony Emma ("Emma"), and Rick Rainville ("Rainville"), and they

4

agreed that BurWil's design was good. [*Id.* at 36]. Walters told them, however, "[Y]ou've got to pay the rent in December and you've got to pay the property taxes that are due. We cannot proceed and will not proceed until we're paid those items." [*Id.* at 36]. Emma responded that Plaintiff inadvertently paid rent for three months and that Plaintiff was going to apply those payments toward the property taxes. [*Id.* at 38]. Walters replied, "No, we're not going to do that." [*Id.* at 39].

In a letter dated December 27, 2018, from Walters to Emma and Rainville, Walters complained that Plaintiff's lease payment was past due for the month of December 2018. [*Id.* at 39, Ex. 7]. In addition, the letter states that although Plaintiff had indicated that Defendant was in default of the lease agreement due to not completing the interior and exterior renovations, Plaintiff was responsible for preparing architectural engineering and designs plans and a cost estimate for any of the proposed renovations. [Ex. 7]. Further, the letter complains that Defendant has not received a summary of rent calculations for September, October, and November 2018. [Ex. 7].

Walters testified that he begged Plaintiff to give him designs. [Doc. 29 at 40]. For example, he asked Rainville to join him on tours to nearby country clubs and that he passed along two names of interior designers. [*Id.* at 41]. Walters testified that he has not received any rent in 2019. [*Id.* at 45].

Finally, Walters testified that he has played the course twice in about eighteen months. [*Id.* at 46]. He stated that Plaintiff used the words "Ritz Carlton" in maintaining the Property, but the Property is not like the Ritz Carlton. [*Id.*]. He stated that the golf superintendent is frustrated because he does not have the chemicals to maintain the golf course. [*Id.* at 47]. Walters testified that there is no landscaping on the golf course. [*Id.*]. He stated that sometimes there is no one at the pro shop and that the phones are not answered. [*Id.*].

On cross examination, Walters testified that the upper level of the clubhouse is a banquet-type facility with a bar and a commercial kitchen. [*Id.* at 56]. The upper level also has restrooms, a lobby, and a main entrance. [*Id.*]. The lower level of the clubhouse contains a pro shop, the 19th hole, and locker rooms. [*Id.*]. At the time Defendant leased the Property, the upper level was not in great shape and the lower level was in good shape but not in great shape. [*Id.*]. Walters stated that the upper level is in better condition because he and Bowman spent over $200,000 on the upper level. [*Id.* at 57]. Walters clarified that the upper level has been demolished at Plaintiff's request in order to get it prepared to be remodeled by Plaintiff. [*Id.*]. He acknowledged that the upper level is unusable in its current condition. [*Id.* at 58].

Walters stated that the Lease Agreement was signed on April 10 with a commencement date of April 1. [*Id.* at 62]. He explained that Defendant allowed Plaintiff to start mid-March so it could get a head start. [*Id.*]. He stated that the parties agreed that rent would start in July. [*Id.* at 63]. Walters testified that he believes that the Lease Agreement refers to the fact that Defendant forgave rent in the month of April and May and that paragraph 5(c) of the Lease Agreement discusses rent being forgiven on a daily basis until all of the licenses and approvals were granted. [*Id.*]. Walters stated that it was within Plaintiff's discretion on when to apply for those licenses. [*Id.* at 63-64]. He stated that based on Plaintiff's procrastination, the certificate of occupancy was not received until July 13, 2018. [*Id.* at 64]. Walters stated, "July 13 should have been the start date of the lease." [*Id.*]. Walters stated that with respect to the liquor license, he urged Plaintiff to move quickly because in Tennessee, it can take up to ninety (90) days to receive a liquor license. [*Id.* at 64-65]. Plaintiff obtained its liquor license on August 18, 2018. [Ex. 12].

Walters testified that the initial work was completed in the spring of 2018. [Doc. 29 at 67]. With respect to the work due by April 30, 2018, such work was completed in May 2018. [*Id.* at 68]. With respect to the Third Phase of Interior Improvements, a new glass entry door has not

6

been installed at the Clubhouse. [*Id.* at 70]. With respect to cleaning and renovating the clubhouse bathrooms, Walter testified that the bathrooms were removed per Emma's request because they needed extensive renovations, and it would have been easier to design the bathrooms from scratch. [*Id.* at 71]. Walters acknowledged that there are no bathrooms present on the main level of the clubhouse. [*Id.* at 72]. Walters stated that the third, fourth, fifth, and sixth improvements have not been done because Plaintiff has not provided the scope of work. [*Id.* at 73].[2] Walters testified that the HVAC (the eighth improvement) was replaced with a new one. [*Id.* at 77].

With respect to the Exterior Improvements, Walters stated that the deadline to complete these was July 29, 2018. [*Id.*]. Walters testified that the Exterior Improvements were not finished because these were the improvements that Plaintiff worked exclusively on with JASA and never decided on plans. [*Id.* at 80]. Walters stated these were not completed because Plaintiff did not approve the plans. [*Id.*]. Walters stated that in December, Plaintiff provided plans for the Exterior Improvements with BurWil, but Defendant refused to pay for it because it was not collecting any rent and the property taxes were not being paid. [*Id.* at 83]. When asked if he did not do the renovations because Plaintiff had not paid the rent, Walters explained:

> It wasn't the only reason. The fact there was no communication. The fact that they did not pay rent. The fact that they did not pay taxes. The fact that it took us about four or five months to collect reimbursement on utility bills. The fact that I got called from vendors that they weren't being paid. A lot of reasons why we didn't do it. But the primary one was the property taxes. Those property taxes were due, very clearly, by the tenant, KOVA. They did not pay them and would not pay them and haven't paid them for this year either.

---

[2] Exhibit F to the Lease Agreement provides that the Third Phase Interior Improvements, include the following: (1) install a new glass entry door to the Clubhouse, (2) clean and renovate the Clubhouse lobby and bathrooms, and cause same to be ADA compliant, (3) replace the lobby ceiling and install lightening and fixtures, (4) replace the wallpaper in the clubhouse lobby, (5) paint the clubhouse hallways, (6) replace the flooring in the clubhouse lobby, (7) erect a temporary wall to separate the Clubhouse lobby from the ballroom, and (8) repair or replace the HVAC, and (9) remediate the air quality. [Ex. 1].

[*Id.*].  Walters testified that the 2018 taxes were payable by the end of February 2019.  [*Id.* at 83-84].  He stated that Plaintiff was supposed to prorate the taxes and pay it monthly because that is what Plaintiff wanted to do.  [*Id.* at 84].

Walters testified to receiving an email from Emma on May 31, 2018, expressing Emma's concerns "with the state of the building, ongoing progress of the landlord[']s work, the ability for [Plaintiff] to obtain the necessary licenses, permits and lack of response for the proposed construction under the [Defendant's] responsibilities set forth in the lease and outlined in the spreadsheet delivered this morning."  [Ex. 13].   He also testified to an email dated June 11, 2018, that he authored regarding June's rent and utilities.  [Ex. 14].

Walters testified that the first two phases were completed in a timely manner.  [Doc. 29. at 91].  Walters stated that the last two phases, Plaintiff was working with JASA in the summer of 2018.  [*Id.* at 91-92].  Walters acknowledged that he sent Brian Rose, JASA's representative who was onsite, an email dated September 3, 2018, which states as follows:

> Based on the information I have……the downstairs of the country club should be ready or near ready to be open for the food and beverage portion of the business.  The golf operations have been operational since Mid march.
>
> Please confirm.
>
> With that portion of the project completed…..please hold off on all other projects regarding the country club that pertain to [Defendant.] This includes any design work or renderings and of course any repairs or construction.
>
> If [Plaintiff] directs any repairs…construction…design or renderings, please make note that this in an agreement between [Plaintiff] and JASA….and not [Defendant].
>
> If anything changes in the near future….I will let you know.
>
> I just want to clear up any issues regarding the scope of work from this point forward.

[Ex. 15]. Walters explained that the purpose of the email was to delineate the work that Defendant was required to do and that Plaintiff asked JASA to perform, because Plaintiff made additional requests for which Defendant was not responsible. [Doc. 29. at 97].

On December 18, 2018, Rainville sent Walters a letter via email with the subject, "Notice of Default." [*Id.* at 99]. The letter states that Section 7 of the Lease Agreement requires Defendant to complete certain improvements and that the Second Phase Interior Improvements and the Initial Work were not completed until September 7, 2018, beyond their respective deadlines. [Ex. 16]. The letter states that Defendant is currently in default for failing to complete the Third Phase Interior Improvements and the Exterior Improvements, and therefore, Plaintiff will cease paying rent due under the Lease Agreement until the improvements are completed. [Ex. 16]. Finally, the letter states that the rent that has been paid, in the amount of $23,471.30, shall be credited against future rent payments that may be due once Defendant fulfills its obligations. [Ex. 16]. Walters testified that he does not believe that he responded to Rainville's email. [Doc. 29 at 101].

On re-direct examination, Walters stated that he wrote the September 3 email because Brian Rose was frustrated that he was supposed to be doing work on the first two phases, but he was asked to perform other tasks. [*Id.* at 104-105]. Walters explained that the email was to clarify that any additional improvements at Plaintiff's request would be between Plaintiff and JASA, not Defendant. [*Id.* at 105]. He stated that JASA submitted a proposal dated September 20, but Plaintiff never approved it. [*Id.* at 106]. With respect to taxes, in the original term sheet and talking points, the parties agreed as follows: "KOVA to pay a monthly reimbursement to Bristol Preservation (lessor) for amortized state and local real estate taxes for the leased property." [*Id.* at 107, Ex. 17].

Walters testified that he received a letter in October 2018 via email from Interior Design Associates. [Doc. 29 at 109, Ex. 18]. The letter was dated September 21, 2018, and it included

an interior design proposal, which was originally sent to Rainville. [Doc. 29 at 109]. Walters testified that Plaintiff never accepted this proposal. [*Id.*]. Walters further testified that the JASA proposal for September 2018 was for the exterior improvements and that Defendant never acted upon those improvements because Plaintiff never approved the work. [*Id.* at 112]. He stated that the proposal from BurWil in December 2018 was also for the exterior improvements. [*Id.* at 117].

### B. William Prince, Sr.

William Prince, Sr., ("Prince") is currently employed with BurWil as the President and the CEO. [*Id.* at 121]. Prince said that he was contacted by Plaintiff in approximately November 2018. [*Id.*]. He spoke to Ken Crowder, and Crowder asked Prince to meet at the Property to look at the renovations at the clubhouse. [*Id.*]. They discussed the exterior and interior renovations. [*Id*]. He provided Plaintiff with detailed estimates of the work. [*Id.* at 122]. Prince stated that he saw Walters and that Walters said that the project and budget looked acceptable and that "it would be released upon other arrangements with the tenant." [*Id.* at 124]. Prince was advised that there was an issue concerning payment of rent and taxes, but once settled, the project could move forward. [*Id.* at 124]. BurWil did not enter into a contract with either party. [*Id.* at 125].

### C. Rick Rainville

Rainville testified that he is employed with Kova Golf Management, Plaintiff's sole member. [*Id.* at 129]. He is the president and has oversight over all the club operations. [*Id.* at 130]. He reviewed the Lease Agreement and signed it on Plaintiff's behalf. [*Id.* at 134-35].

Rainville testified that the Third Phase of Interior and Exterior Improvements were material inducements for Plaintiff because he saw the country club as a venue space. [*Id.* at 135]. Rainville stated that on the date that the Lease Agreement was signed, April 10, he expected to move into the lower level of the clubhouse. [*Id.* at 136-37]. The lower level, however, was not ready. [*Id.* at 137]. He explained that there was no infrastructure for internet, there were roof issues, and he

did not have satisfactory confirmation regarding air quality testing. [*Id.* at 137]. Plaintiff moved into the lower level of the clubhouse around the first week of May. [*Id.*].

Rainville testified that when Plaintiff moved in, the clubhouse was not immediately opened for business because there were plumbing issues with the bathrooms and there were no restaurant capabilities at that point. [*Id.* at 138]. Rainville testified that when Plaintiff moved in, he assumed that there was a certificate of occupancy for the building but later discovered that there was not. [*Id.*]. Plaintiff also applied for a liquor license, but the license was originally denied because there was no certificate of occupancy. [*Id.*].

Rainville testified that the Second Phase Interior Improvements were supposed to be completed by April 30, 2018, but they were not. [*Id.* at 139-140]. He explained that the kitchen equipment was not cleaned or fully operational. [*Id.* at 139]. Rainville testified that he had the kitchen inspected in preparation of the health department's visit, but in May 2018, the kitchen would not have passed code. [*Id.*]. Rainville stated that Defendant has in part completed the initial work and the Second Phase Interior Improvements. [*Id.*].

Rainville testified that on May 30 or 31, there was a major flooding event, and water entered the building. [*Id.* at 140]. Rainville explained that there was water in the lower level and that the office in the lower level was completely flooded. [*Id.*]. Rainville stated that pursuant to the Lease Agreement, Defendant is required to maintain the roof structure and the foundation of the Property. [*Id.* at 141]. Rainville testified that Plaintiff received the certificate of occupancy on July 13, 2018, but this did not apply to the grill. [*Id.* at 144]. In July, Plaintiff did not have a liquor license or a restaurant permit. [*Id.* at 145]. It received the liquor license on August 18, 2018, and the downstairs grill opened on September 7, 2018. [*Id.*].

Rainville testified that after Walters sent the September 3 email to JASA, JASA did not do any further work on the Property. [*Id.* at 146]. Rainville stated that after the downstairs grill

opened, it began making payments to Defendant, but only because Rainville made a mistake. [*Id.* at 147]. Rainville explained that Walters was regularly asking/pushing for rent and that after Rainville got the lower level and restaurant opened, he believed that Defendant was going to continue to do the work that was agreed to in the Lease Agreement. [*Id.*]. Rainville stated, "I simply approved payment of rent for September, prorated September, and then we put it into our accounting system as an automatic payable." [*Id.*]. Rainville stated that the first payment in September was prorated from the date of opening—that is September 7 through the remainder of September. [*Id.*]. Plaintiff made rent payments in October and November and then stopped. [*Id.* at 148]. Rainville stated that the rent payments were a mistake and that he lost track of time. [*Id.*]. He stated that there was no work being done and that he had not heard from JASA. [*Id.*]. He stated that his team got together and reviewed the Lease Agreement, and Rainsville realized that he had made a mistake by paying the rent. [*Id.*]. Rainville notified Defendant that he was discontinuing those payments. [*Id.*].

Rainville stated that between September and December 2018, Defendant did not do any work on the Third Phase Interior Improvements. [*Id.*]. In addition, Defendant did not do any work on the Exterior Improvements. [*Id.* at 149]. In November 2018, Plaintiff began soliciting other estimates for the work to be done. [*Id.*]. Plaintiff reached out to BurWil and requested an estimate. [*Id.*]. Rainville received the estimate on December 9, 2018, via email. [*Id.* at 151].

Rainville testified to a number of photographs that showed the Property in need of repair. [*Id.* at 152, Ex. 25]. Rainville testified that Plaintiff charges its members only half of what it anticipated charging because it does not have a "fully amenitized club." [Doc. 29 at 161]. Rainville testified, "If the clubhouse is renovated and you create a venue, it is a viable club; without, it is not." [*Id.* at 165].

On cross examination, Rainville testified that he never disapproved the JASA proposal. [*Id.* at 165-66]. With respect to the JASA proposal, Rainville said he provided comments on what he would like to see completed and that he never heard back from JASA or Defendant. [*Id.* at 166]. Rainville stated that he made no representations or decisions on the actual proposal estimate. [*Id.* at 168]. He stated that the estimate was not very detailed. [*Id.*]. Rainville acknowledged that pursuant to the Lease Agreement, the work was to be done to Plaintiff's reasonable satisfaction. [*Id.* at 169]. Rainville testified that there was no dispute that only two months and a partial month were paid by Plaintiff in fixed rent, but Rainville stated that such payments were a mistake. [*Id.* at 177]. Rainville also made one monthly percentage rent payment but stated that that payment was also a mistake. [*Id.* at 178]. With respect to taxes, Rainville testified, "We have informed them that they can use the money we paid them inadvertently for rent to pay the taxes to reimburse themselves." [*Id.*]. Rainville further testified, "I believe that we should be there and not pay rent because that's what the lease stipulates. If the work is done, we pay rent." [*Id.* at 181].

Rainville testified that he communicated his reasonable satisfaction to BurWil. [*Id.* at 182]. He agrees that paragraph (e) of the Lease Agreement stated that it is the tenant's obligation to prepare architectural engineering and design plans and that he did not do that. [*Id.* at 182]. He explained that he received a proposal but could not finish that phase without having the other phases completed. [*Id.* at 182-83]. Rainville opined that Defendant breached the Lease Agreement and that as a result, he provided Defendant a notice of default. [*Id.* at 187]. Rainville testified that he has not terminated the Lease Agreement. [*Id.* at 188].

With respect to operations, Rainville testified that Plaintiff employs an executive chef that runs the food and beverage operation, a superintendent that runs the golf course operation, and a golf professional that runs the golf operation. [*Id.* at 191]. He also employs frontline employees in all of those areas. [*Id.*]. Rainville stated that the first tee time is 8:00 a.m. [*Id.* at 192]. Rainville

testified that there was not a golf professional for 35 to 45 days because the golf professional had left.  [*Id.* at 193].  He stated that he has hired a full-time golf professional.  [*Id.*].  He testified that the snack bar is closed on Monday and Thursday.  [*Id.*].  He testified that the greens were aerated about 14 months ago and that they do not have to be aerated on an annual basis.  [*Id.*].  Finally, Rainville testified that he pled guilty to a crime.  [*Id.* at 203].

On re-direct examination, Rainville testified that he sent his comments to JASA on July 26, 2018.  [*Id.* at 205].  He also testified to an email dated September 4, 2018, from Walters to Rainville, Emma, and Bowman, wherein Walters stated that the subcontractors and Plaintiff may have delayed projects.  In the email, Walters also inquired as to the lease payments and property taxes.  [*Id.* at 207, Ex. 25].  He stated that on September 4, the downstairs grill was not opened for business.  [Doc. 29 at 207].  Finally, he testified to an email dated January 11, 2018, from Walters to Emma and himself.  [Ex. 36].  The email states, in relevant part, as follows:

> Since you have provided a scope of work that we all agree would be great….please get the rent paid up to date…the taxes paid…and the letter we required that would clear up your previous email.  We will then immediately contact Burwil and enthusiastically start the project.

[Doc. 29 at 208, Ex. 36].

## III.    POSITIONS OF THE PARTIES

Defendant moves [Doc. 15] pursuant to Federal Rule of Civil Procedure 64 and Tennessee Code Annotated § 29-18-101 to enter judgment for possession in its favor for the Property.  In aid of the judgment for possession, Defendant requests that a writ of possession issue, if necessary, ten days following this Court's entry of judgment for possession.  Defendant argues that Plaintiff materially breached the Lease Agreement by failing to pay taxes and rent, failing to maintain adequate insurance, and failing to operate the country club in a competent and professional manner. Defendant argues that Plaintiff has not cured these breaches.  Defendant argues that not only does

14

Tennessee law allow for Defendant to retake possession for Plaintiff's breaches, but the Lease Agreement allows Defendant to retake possession and continue to hold Plaintiff liable for all sums under the Lease Agreement.

Plaintiff responded [Doc. 20] in opposition to the Motion. Plaintiff argues that Defendant's Motion presents no support for the extension of Rule 64 to allow a forceable detainer under Tennessee's state law. Plaintiff explains that removing it from the Property will not secure satisfaction of a potential judgment. Plaintiff states that to the extent that the Court extends Rule 64 to include forceable detainers under Tennessee Code Annotated § 29-18-101, Defendant is not entitled to the same. Plaintiff argues that it is not in breach of the Lease Agreement and to the extent it is in breach, the prior material breach by Defendant forecloses Defendant's ability to recover damages. Thus, Plaintiff asserts that it remains entitled to possession of the Property.

Further, Plaintiff claims that its obligation to pay rent was abated pursuant to the terms of the Lease Agreement. Plaintiff states that it has maintained insurance and attaches copies of the policies showing such coverage. In addition, Plaintiff states that it does not owe property taxes and that it has operated the club in a professional and competent manner. Plaintiff maintains that Defendant is not entitled to damages due to its earlier, material breach of the Lease Agreement, explaining that Defendant's first material breach of the Lease Agreement occurred on October 30, 2018, when it failed to complete the Third Phase Interior Improvement.

Defendant replies [Doc. 21] that Plaintiff has operated the club for nearly a year and a half without payment of taxes or rent, except three payments in the fall of 2018. Defendant disputes that Plaintiff has paid the property taxes. Further, Defendant argues that the Lease Agreement requires rent payments, which Plaintiff has not paid. Defendant maintains that Tennessee's forcible entry and detainer statutes apply to the instant Motion.

The parties also filed post-hearing briefs [Docs. 31, 32], which the Court has also considered.

## IV.    ANALYSIS

The Court has carefully considered the arguments and the evidence in this case. Accordingly, for the reasons described below, the Court **RECOMMENDS** that Defendant's Motion [**Doc. 15**] be **GRANTED**.

The Court will begin with Rule 64 and then turn to the facts in this case.

### A.    Rule 64

Defendant relies on Rule 64, which provides, in relevant part: "At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment. But a federal statute governs to the extent it applies."  Fed. R. Civ. P. 64(a).  Defendant requests that the Court, through Rule 64, apply Tennessee's unlawful detainer statute in this case, which provides as follows:

> Unlawful detainer is where the defendant enters by contract, either as tenant or as assignee of a tenant, or as personal representative of a tenant, or as subtenant, or by collusion with a tenant, and, in either case, willfully and without force, holds over the possession from the landlord, or the assignee of the remainder or reversion.

Tenn. Code Ann. § 29-18-104.  "Tennessee's unlawful detainer statute creates a right to bring a cause of action for a writ of possession when a lessee remains on leased property after the lease has been terminated."  *Fed. Nat'l Mortg. Ass'n v. Daniels*, 517 S.W.3d 706, 712 (Tenn. Ct. App. 2015).

There is very little, if any, case law on whether Rule 64 can be used in order to evict a party.  Defendant cites to a Sixth Circuit unpublished decision.  Although somewhat different than the present matter, the Sixth Circuit did affirm the district court's decision to grant summary

16

judgment to the landlord and evict the tenant. *Mantey, Mon Ami, Lonz Wineries, Inc., v. Buckantz*, No. 89-3452, 1990 WL 68857 (6th Cir. 1990). Specifically, plaintiff/tenant sued his landlord and requested specific performance of an alleged contract to purchase a restaurant. *Id.* The landlord denied the allegations and filed a counterclaim, alleging that the tenant continued to occupy the property despite the expiration of the lease. *Id.* After the bench trial, the court found in favor of the landlord, but the tenant did not vacate the restaurant. *Id.* Before the judgment was entered, the landlord filed a second case, claiming possession and requesting that the court evict the tenant. *Id.* The court granted summary judgment in favor of the landlord and ordered the tenant to vacate. *Id.* The tenant argued on appeal that the district court wrongfully exercised ancillary jurisdiction over the second case. *Id.* The Sixth Circuit disagreed holding, "[A]ny decision in the [e]viction [c]ase would have required an interpretation of the district court's opinion in the [first case]." *Id.*

The instant matter is in a different procedural posture than the circumstances in *Buckantz*, because the Court has not determined any dispositive issues in this case. During the hearing, however, the parties put on sufficient proof in order for the Court to make a recommendation.[3] Accordingly, the Court recommends that Defendant be granted possession of its Property due to Plaintiff's material breach of the Lease Agreement. *See OMP v. Security Pacific Business Fin., Inc.*, No. WC86-132-GD-D, 1986 WL 28914, at *5 (N.D. Miss. Nov. 17, 1986) (finding defendant is entitled to possession of the property pursuant to Rules 57 and 64, after an evidentiary hearing).

**B.   Facts**

The issues in this case are relatively straightforward. Plaintiff primarily argues that Defendant materially breached the agreement by failing to make the specific improvements to the

---

[3]   During the hearing, the Court explained that in the Report and Recommendation, the undersigned would essentially be making a recommendation on liability.

Property, while Defendant argues that Plaintiff breached the Lease Agreement by failing to pay rent and taxes and by failing to operate the Property in a competent manner.[4]

In Tennessee, the interpretation of a contract is a question of law. *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 526-27 (Tenn. 2012). The Court's role is to ascertain the intention of the parties, which is based on the ordinary meaning of the language contained within the four corners of the contract. *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011). Further, in determining whether a breach of a contract is "material," Tennessee courts have adopted the following factors:

> (1) The extent to which the injured party will be deprived of the expected benefit of his contract;
>
> (2) The extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (3) The extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (4) The likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and
>
> (5) The extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Gerulis v. Jacobus*, No. M200900886COAR3CV, 2010 WL 1644991, at *6–7 (Tenn. Ct. App. Apr. 23, 2010) (other citations omitted).

---

[4] In Defendant's opening brief, Defendant also argued that Plaintiff did not maintain commercial liability and workers' compensation insurance. In Response [Doc. 20], Plaintiff argued that the Lease Agreement requires it to keep in effect insurance against claims for personal injury and property damage arising from occurrences on or in the Club and attached a number of insurance related documents. Defendant did not mention its insurance allegations in its reply brief and did not argue or present evident at the hearing regarding Plaintiff's insurance or lack thereof. It appears that Defendant has abandoned this argument.

18

The Lease Agreement is not a model of clarity, and both parties have offered and testified to their interpretations of the provisions therein. Accordingly, the Court has reviewed the Lease Agreement and finds as follows:

**1.      Lease Agreement**

Both parties have certain obligations under the Lease Agreement that are relevant to the current dispute. The Court will begin with Plaintiff's obligations and then turn to Defendant's obligations.

The Lease Agreement required Plaintiff to pay three types of rent: (1) fixed, (2) monthly percentage, and (3) food and beverage percentage. [Ex. 1 § 5(a-c)]. Fixed rent, or "Monthly Fixed Rent" commenced on June 1, 2018, and was $6,250 per month. [Ex. 1 § 5(a)]. Monthly Percentage Rent commenced on May 1, 2018, and it included gross revenues for a number of items, except food and beverage sales. [Ex. 1 § 5(b)]. Finally, Food and Beverage Percentage Rent, or "F&B Percentage Rent" commenced on April 1, 2018, and was calculated at 5% of the food and beverage gross revenue from the prior calendar month. The term "Rent" is also defined in the Lease Agreement as Monthly Fixed Rent and Monthly Percentage Rent. The term "Rent" does not include F&B Percentage Rent. [Ex. 1 § 5(b)].

The Lease Agreement also obligated Plaintiff to pay taxes. [Ex. 1 § 12]. Specifically, the Lease Agreement states, "Tenant shall pay the Tax Bills prior to the date such Tax Bills become past due." [*Id.*]. Finally, the Lease Agreement obligated Plaintiff to "manage and operate the Golf Course, Clubhouse, and other facilities located at the Lease Premises on a continual basis through the term of this Lease and in a professional and competent manner, consistent with the management and operational practices at golf courses similar to Golf Course in Tennessee and surrounding areas." [*Id.* at § 9].

Turning to Defendant's obligations, the Lease Agreement obligated Defendant to perform certain work by deadlines. In fact, Plaintiff's obligation to pay *some* rent was contingent upon Defendant performing the improvements by deadlines. For instance, Defendant was required to repair the HVAC system, clean carpets, and cause the pro shop, bathrooms, and two offices located on the lower level of the Clubhouse to be operational (collectively, "Initial Work") on or before the Commencement Date, which is defined as April 1, 2018. [Ex. 1 §§ 2, 7(a)]. If Defendant did not complete the Initial Work, "[t]he Commencement Date and Tenant's obligation to pay Monthly Percentage Rent shall not commence and shall be extended daily" until such improvements are complete. [Ex. 1 § 5(f)].

Further, Defendant was also required to complete the Second Phase Interior Improvements, to Plaintiff's reasonable satisfaction, on or before April 30, 2018. There is no rent abatement in relation to completing the Second Phase Interior Improvements.

In addition, Defendant was required to complete Third Phase Interior Improvements, to Plaintiff's reasonable satisfaction, on or before June 30, 2018. [Ex. 1 § 7(c)]. The Third Phase Interior Improvements is more fully described in Exhibit F to the Lease Agreement. Some of the listed improvements require Plaintiff to choose the materials. Others do not. For instance, Plaintiff had the exclusive right to select the materials for the lobby ceiling and the lighting and fixtures but did not have the exclusive right to choose the new glass entry door to the clubhouse. The consequence for Defendant's failure to complete the Third Phase Interior Improvements is that "all Rent" shall abate until such improvements are complete. [Ex. 1 § 7(c)]. Again "Rent" is defined as Monthly Fixed Rent and Monthly Percentage Rent. [Ex. 1 § 5(b)].

The provision outlining the Exterior Improvements, as more fully described in Exhibit G, states that such improvements, to Plaintiff's reasonable satisfaction, shall be completed on or before July 30, 2018. [Ex. 1 § 7(d)]. Unlike the provision regarding the Third Phase Interior

Improvements, Plaintiff does not have the exclusive right to select the material. The consequence for failing to complete the Exterior Improvements is that "all Rent" shall abate until they are completed. [*Id.*]. Again, "Rent" is defined as Monthly Fixed Rent and Monthly Percentage Rent. [Ex. 1 § 5(b)].

Finally, the last provision regarding improvements involves the Main Level Renovation. Here, however, Plaintiff shall "prepare architectural, engineering, and design plans, along with a cost estimate, for the renovation" on or before December 31, 2018. [Ex. 1 § 7(e)]. Defendant was to commence work no later than February 1, 2019. [*Id.*].

## 2. Default

As mentioned above, both parties argue that the other party breached the Lease Agreement. After considering the Lease Agreement and the parties' conduct in this case, the Court finds that while both parties to some extent, did not fully comply with the Lease Agreement, Plaintiff committed a material breach when it failed to pay taxes on the Property.[5]

Walters testified that Plaintiff failed to pay taxes on the Property, and Plaintiff has not disputed such testimony. Walters testified that he told Plaintiff to pay taxes in December 2018, explaining that while taxes were not due until the end of February 2019, Walters requested that Plaintiff pay taxes pursuant to the parties' agreement prior to signing the Lease Agreement. The parties' prior agreement conflicts with the Lease Agreement, which provides, "Tenant shall pay the Tax Bills prior to the date such Tax Bills become past due." [Ex. 1 § 12]. Further, the Lease Agreements contains an "Entire Agreement" provision, stating: "There are no covenants, promises, agreements, conditions or understandings, either written or oral, between the parties

---

[5] Plainly, there are contested issues of material fact as to what extra-contractual or post-contractual agreements were or were not made by and between the parties, which must be resolved at trial. The Court, however, is satisfied that the default analysis herein is shown as a matter of law.

other than as herein set forth." [Ex. 1 § 39]. Regardless, however, Plaintiff has not paid the taxes when they became due under the Lease Agreement. The Court finds that Plaintiff's failure to pay taxes, prior to the date they became past due, constitutes a material breach of the Lease Agreement.

With respect to the improvements, the Court finds both parties did not comply with their obligations under the Lease Agreement, but the Court does not find the parties' breaches to be material. First, Defendant acknowledged that the Initial Work and the Second Phase of Interior Improvements were not completed by the deadline set forth in the Lease Agreement. The remedy, however, at least with respect to the Initial Work, was that all Rent (which is defined as Fixed Monthly and the Monthly Percentage Rent) would abate until such improvements were completed.[6] It appears that communications between the parties broke down over the Third Phase of Interior Improvements, and both parties breached this provision of the Lease Agreement. There are nine improvements that were supposed to be completed by June 30, 2018. Plaintiff had the exclusive right to select the material for four of those projects. Plaintiff did not do so, and therefore, Defendant could not complete its obligation as to those four projects. For instance, it was Plaintiff's obligation to choose the lighting and fixtures. Defendant obviously cannot install such items until Plaintiff chooses them. However, Defendant did not complete the remaining projects that do not require Plaintiff to select the material. For instance, Defendant was required to install a new glass entry door to the Clubhouse. Walters acknowledged that this project was not done.[7] Again, the remedy for the improvements not completed by the deadline was the abatement

---

[6] In its post-hearing brief, Defendant argues that Rent does not abate and that when read in conjunction with § 8 of the Lease Agreement, Plaintiff could pay for the improvements and deduct the cost from the rent owed. Given that the Court is not determining damages, the Court need not decide whether this strained interpretation of the Lease Agreement is correct.

[7] The Court notes that Defendant attempts to argue that all projects had to be done to Plaintiff's "reasonable satisfaction," which means that Plaintiff had to provide the scope of the work prior to Defendant starting such work. The Court agrees that in each section of the Lease Agreement, improvements must be done to Plaintiff's "reasonable satisfaction." There is also

of "all Rent."  Finally, Plaintiff acknowledged that he did not provide the plans for the Main Level

Restorations on or before December 31, 2018.  [Ex. 1 § 7(e)).].[8]

Further, Defendant claims that Plaintiff breached the Lease Agreement by failing to pay

rent.  As explained above, it appears that some Rent abated if improvements were not completed

by the deadline.  F&B Percentage Rent did not abate; however, there was no evidence introduced

regarding such rent (and whether any of the amounts that Plaintiff did pay would cover such rent).

Based on what has been presented, the Court finds Defendant's argument not well taken at this

time, although it could prove to be upon a trial on the merits.

Finally, Defendant also alleges that Plaintiff did not operate the Property in a competent

and professional manner.  As mentioned above, the Lease Agreement requires that Plaintiff operate

the Property "in a professional and competent manner, consistent with the management and

operational practices at golf courses similar to Golf Course in Tennessee and surrounding areas."

[Ex. 1 § 9].  While the Court heard some evidence that Plaintiff had some staffing issues, the Court

cannot find, based on what was presented, that Plaintiff breached this provision in the Lease

---

evidence in the record that Plaintiff worked directly with the contractors.  The Court's
interpretation of the Lease Agreement, however, does not require Plaintiff to provide the scope of
work on all phases of the project.  For instance, with respect to the Third Phase Interior
Improvements, several items specifically require Plaintiff to assist with the scope of work.  [Ex.
1] ("Tenant shall have the exclusive right to select the material for the Third Phase Improvements
identified above by an asterisk.").  Others do not. Further, the Main Level Restoration specifically
directed Plaintiff to prepare the design plans, while the other provisions do not.  Defendant is
essentially arguing that Plaintiff's satisfaction is a condition precedent for performing the work
but has not provided any argument regarding condition precedents.  *See Harlan v. Hardaway*, 796
S.W.2d 953, 957–58 (Tenn. Ct. App. 1990) ("Courts do not favor conditions precedent and will,
as a general matter, construe doubtful language as imposing a duty rather than creating
a condition precedent" and that the "presence of a condition is usually signaled by a condition
word or phrase such as 'if,' 'provided that,' 'when,' 'after,' as soon as,' and 'subject to.'") (other
citations omitted).

[8] The Court notes that the Main Level Restoration paragraph is the only paragraph that
states such improvements are a material inducement for Plaintiff to enter into the Lease
Agreement.  [Ex. 1, § 7(f)].  As mentioned above, Plaintiff did not provide the scope of work,
which was specifically required for the Main Level Restoration.

Agreement. Again, there are disputed issues of fact as to this issue, which may be resolved upon a trial on the merits.

Finally, according to the Lease Agreement, Defendant may pursue any available legal and equitable remedy in the event Plaintiff commits a breach. [Ex. 1 § 21]. The Court finds that Plaintiff materially breached the agreement by failing to pay taxes. Defendant has chosen to pursue a detainer warrant and given the circumstances (i.e., Plaintiff is occupying Defendant's Property without paying taxes), the Court **RECOMMENDS** Defendant's request be **GRANTED**.

## V. CONCLUSION

Accordingly, for the reasons set forth above, the Court **RECOMMENDS**[9] that Defendant's Motion for Judgment for Possession [**Doc. 15**] be **GRANTED**.

Respectfully submitted,

*Bruce Guyton*

United States Magistrate Judge

---

[9] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Federal Rule of Civil Procedure 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 153-54 (1985). "[T]he district court need not provide *de novo* review where objections [to the Report and Recommendation] are '[f]rivolous, conclusive or general.'" *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir.1982)). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

24