UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | |
|---|---|
| KOVA BRISTOL TENN 1894, LLC, | ) |
| | ) |
| Plaintiff, | ) 2:19-CV-00084-DCLC-CRW |
| | ) |
| vs. | ) |
| | ) |
| BRISTOL PRESERVATION, LLC, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court to address Plaintiff KOVA Bristol TENN 1984, LLC's Motion for Partial Summary Judgment [Doc. 34]. Defendant Bristol Preservation, LLC filed a response [Doc. 41] and Plaintiff replied [Doc. 46]. Defendant then filed a sur-reply with leave of Court [Doc. 50]. This matter is now ripe for resolution. For the reasons that follow, Plaintiff's Motion for Partial Summary Judgment [Doc. 34] is **DENIED**.

**I.    BACKGROUND**

In April 2018, Plaintiff entered into a Lease Agreement ("Lease") with Defendant to rent the Country Club of Bristol ("the Club"), which consists of, among other things, a golf course and a two-level clubhouse [Doc. 1-1, p. 1]. The main level of the clubhouse contains a ballroom, a bar area, a commercial kitchen, restrooms, a lobby, and the main entrance [Doc. 41-1, p. 46]. The lower level of the clubhouse contains of a golf shop, men's and women's locker rooms, restrooms, offices, and a restaurant [Doc. 41-3, p. 19]. The clubhouse is at the center of the current dispute between the parties. Regarding the clubhouse and the Club as a whole, the parties had various obligations as provided for in the Lease. Therefore, the Court will describe the parties' respective obligations before providing the factual and procedural background underlying the current matter.

1

### A. Defendant's Obligations

Pursuant to the paragraph 1(c) of the Lease, Defendant warranted and represented that as of April 1, 2018, Defendant would "deliver the Leased Premises to [Plaintiff] in an operating condition (not including further work to be completed as provided under the Lease) to be immediately opened for business," and that there was "no existing mold in the Clubhouse" [Doc. 1-1, p. 2]. Paragraphs 7(a) through (e) of the Lease required the following phases of work to be completed by Defendant: (1) Landlord's Initial Work; (2) Second Phase Interior Improvements; (3) Third Phase Interior Improvements; (4) Exterior Improvements; and (5) Main Level Renovations [*Id*. at p. 4-5]. The Lease required each phase to be completed to Plaintiff's "reasonable satisfaction" [*Id*.].

Landlord's Initial Work required the following work on the lower level of the clubhouse to be completed by April 1, 2018: (1) repair the HVAC, (2) remediate the air quality, (3) clean the carpets, and (4) cause the golf shop, bathrooms, and offices to be operational [*Id*. at p. 4]. The Second Phase Interior Improvements, to be completed by April 30, 2018, required Defendant to (1) cause the lower-level kitchen, dining room, and bar to be cleaned and fully operational for immediate use; (2) replace the ceiling above the lower-level kitchen; (3) cause the showers and bathrooms in the lower-level locker rooms to be operational for immediate use; and (4) install a drain under the lower-level ice machine [*Id*. at p. 4 & 39].

The Third Phase Interior Improvements required the following work on the main level to be completed by June 30, 2018: (1) install a new glass entry door; (2) clean and renovate the lobby and bathroom; (3) erect a temporary wall to separate the lobby from the ballroom; (4) repair or replace the HVAC; and (5) remediate the air quality of the main level to the extent necessary [*Id*. at p. 5 & 40]. Additionally, this phase of work included the following, which Plaintiff had the

2

exclusive right to select the materials for: (1) replace the lobby ceiling and installing lighting and fixtures; (2) replace the wallpaper in the lobby; (3) paint the clubhouse hallways; and (4) replace the flooring in the lobby [*Id*. at p. 4 & 40].

The Exterior Improvements required the following work to be completed by July 30, 2018: (1) remove and replace the stone veneer at the front of the clubhouse; (2) wrap the front columns with a wood design; (3) repair or replace the entrance canopy; (4) install new clapboard siding; (5) paint exterior walls, siding, facia, and stairs; and (6) repair or replace the rear steel balcony of the clubhouse [*Id*. at p. 5 & 41]. Finally, the Lease required Plaintiff to submit architectural, engineering, and design plans and a cost estimate for the Main Level Renovations by December 31, 2018 [*Id*. at p. 5]. Defendant would then be required to commence the Main Level Renovations by February 1, 2019 [*Id*.].

B.  **Plaintiff's Obligations**

The Lease required Plaintiff to, among other things, pay property taxes and rent [*Id*.]. The property taxes were to be paid "prior to the date such Tax Bills become past due." [*Id*. at p. 8]. Rent is separated into three types: (1) Monthly Fixed Rent, (2) Monthly Percentage Rent, and (3) Food and Beverage Percentage Rent ("F&B Rent") [*Id*. at p. 3]. Monthly Fixed Rent, in the amount of $6,250, commenced on June 1, 2018 [*Id*.]. Monthly Percentage Rent, five percent of Plaintiff's gross revenue for the prior calendar month, commenced on May 1, 2018 [*Id*.]. The Lease defines Monthly Fixed Rent and Monthly Percentage Rent collectively as "Rent" and, in aggregate, these two types of rent were not to exceed $10,000 per month until Defendant completed the Main Level Renovations [*Id*. at p. 3-4]. F&B Rent, five percent of gross revenue from the sale of food and beverages for the prior calendar month, commenced on April 1, 2018

[*Id*. at p. 3]. Notably, F&B Rent is not included in the definition of "Rent" as it is defined in the Lease [*Id*.].

### C. Factual Background

The parties executed the Lease on April 10, 2018 but pre-dated the commencement date to April 1, 2018 [*Id*.]. Plaintiff asserts that the clubhouse was not move-in ready in April due to roofing issues and the lack of an air quality test clearing the lower level [Doc. 41-3, p. 12]. On April 30, 2018, Plaintiff asserts the lower-level kitchen equipment was neither cleaned nor fully operational and that the kitchen was inspected but licenses and permits could not be obtained until the kitchen equipment was operational [*Id*. at p. 14].

Plaintiff moved into the clubhouse the first week of May 2018 but asserts it was still unable to immediately open for business due to the lack of functional bathrooms or restaurant capabilities [*Id*. at p. 13]. Plaintiff asserts there was no Certificate of Occupancy for the clubhouse; thus, when Plaintiff applied for a liquor license, it was denied [*Id*.]. Defendant asserts that the clubhouse always had a Certificate of Occupancy in place [Doc. 41-1, p. 52].

In late May 2018, the clubhouse sustained significant water damage due to a flood [Doc. 41-3, p. 15-16]. Defendant hired Taff & Frye Co., Inc. ("Taff") to remediate the water damage [Doc. 35, p. 7]. Taff removed the main-level walls, ceilings, flooring, and interior drywall on the exterior walls and the lower-level office flooring, ceiling tiles, and drywall [*Id*.]. During this remediation work, Taff discovered the presence of mold and asbestos in the main level of the clubhouse [*Id*.].

On May 31, 2018, Plaintiff sent Defendant a schedule of items that still needed to be completed in order to be fully licensed [Doc. 36, p. 26-27]. Plaintiff informed Defendant that it was concerned with the state of the clubhouse and the ability to obtain necessary licenses and

4

permits [*Id*. at p. 28-29]. On June 11, 2018, Defendant requested payment of rent and utilities from Plaintiff [*Id*. at p. 36]. On July 10, 2018, Plaintiff sent another email to Defendant explaining that the lower level of the clubhouse still had unfinished projects and areas that needed to be completed before Plaintiff could obtain necessary permits and licenses to be fully operational [*Id*. at p. 39]. Plaintiff ultimately obtained a Certificate of Occupancy on July 13, 2018 [Doc. 41-3, p. 19] and a liquor license on August 18, 2018 [Doc. 36, p. 42].

On September 3, 2018, the kitchen equipment that was not up to code was replaced and Plaintiff informed Defendant that once a satisfactory air quality report was received and business was fully operational, rent would commence [*Id*. at p. 46]. Additionally, Plaintiff stated that it was still waiting on Defendant to send estimates for the Exterior Improvements [*Id*.]. On the same day, Defendant contacted J.A. Street and Associates ("JASA"), the contractor for the clubhouse improvements, and instructed them to hold off on any design work, renderings, repairs, or construction [*Id*. at p. 43]. Defendant asserts the purpose of these instructions were to clarify that any work beyond what Defendant had approved was between JASA and Plaintiff [Doc. 41-1, p. 94-95]. JASA did not complete any further work on the clubhouse after September 3, 2018 [Doc. 41-3, p. 21]. Plaintiff informed Defendant on September 4, 2018, that Plaintiff was complying with the terms of the lease which outline the conditions required for commencement of rent payments [Doc. 36, p. 44]. On September 7, 2018, the lower-level restaurant opened for business [Doc. 41-3, p. 20].

JASA sent a proposal for the Exterior Improvements on September 22, 2018 [Doc. 41-4]. Plaintiff informed JASA that the work was Defendant's decision [Doc. 41-3, p. 40-44]. Defendant contends that it received the proposal but did not complete the work because Plaintiff did not approve the proposal [Doc. 41-1, p. 97]. In November 2018, Plaintiff solicited Burwil Contractors

5

("Burwil") to obtain an estimate for the Third Phase Interior and Exterior Improvements [Doc. 41-3, p. 24]. Plaintiff sent these documents and proposals to Defendant on December 9, 2018 [Doc. 36, p. 48-55]. On December 18, 2018, Plaintiff sent Defendant a Notice of Default explaining that the Initial Work and the Second Phase Interior Improvements were not complete until September 7, 2018, that Defendant was in default as to the Third Phase Interior Improvements and the Exterior Improvements, and advised Defendant that payment of rent would cease until these improvements were complete [*Id.* at p. 47]. Furthermore, Plaintiff notified Defendant that the any payments previously made toward rent would be credited against future rent payments [*Id.*].

On December 27, 2018, Defendant sent Plaintiff a letter informing it that December rent was past due, that Plaintiff was required to prepare architectural, engineering, and design plans and cost estimates for the improvements, and that failure to pay December rent by the end of the year would serve as notice of default [*Id.* at p. 56]. Defendant contacted Burwil on January 7, 2019 and explained that it approved the proposals for the Third Phase Interior and Exterior Improvements and that it would finalize a contract once Plaintiff paid property taxes and rent [*Id.* at p. 57]. Defendant then informed Plaintiff on January 11, 2019, that once rent and property taxes were paid, Defendant would contact Burwil and start working on the Third Phase Interior and Exterior Improvements [Doc. 41-3, p. 83]. The city property taxes, in the amount of $11,213, were due on January 7, 2019 and the county property taxes, in the amount of $13,230, were due on February 28, 2019 [Docs. 41-9 & 41-10]. It is undisputed that Plaintiff did not pay these property taxes as required by the Lease.

Defendant contends that the Initial Work was completed in Spring 2018 and the Second Phase Interior Improvements were completed in May 2018 [Doc. 41-1, p. 57-58]. Out of the nine projects required for the Third Phase Interior Improvements, seven were not completed [Doc. 41-

6

3, p. 26-30]. Defendant asserts these projects initially were not completed because Plaintiff failed to provide scope of work [Doc. 41-1, p. 59-67]. Regarding the Exterior Improvements, Defendant asserts that it also did not complete the required projects due to Plaintiff's failure to provide scope of work [*Id.* at p. 70-72]. Once Plaintiff provided scope of work in December 2018, Defendant asserts that it did not complete the projects because Plaintiff was failing to communicate, did not pay rent, did not pay taxes, took four to five months to pay utility bills, and was not paying vendors [*Id.* at p. 59-67]. Finally, it is undisputed that Defendant did not complete the Main Level Renovations because Plaintiff did not submit designs and cost estimates as required by the Lease [*Id.* at p. 72].

Regarding the payment of Monthly Fixed Rent, Plaintiff made a pro-rated payment of $5,000 for September rent on October 4, 2018, a $6,250 payment on October 15, 2018, and a $6,250 payment on November 13, 2018 [*Id.* at p. 12-13]. Additionally, Plaintiff made a $3,750 payment, which Defendant took as payment for one month of Monthly Percentage Rent [*Id.*]. Plaintiff made no payments toward the F&B Rent [*Id.* at p. 6].

### D. Procedural Background

Based on the above facts, Plaintiff filed a Complaint with this Court on May 23, 2019, against Defendant alleging breach of contract, intentional misrepresentation, breach of the covenant of quiet enjoyment, and tortious interference with business relationships [Doc. 1]. Defendant answered and counterclaimed, alleging Plaintiff breached the contract, breached the duty of good faith and fair dealing, and was in unlawful possession of the premises [Doc. 9]. On August 5, 2019, Defendant filed a Motion for Judgment of Possession [Doc. 15], which was referred to the magistrate judge. After holding an evidentiary hearing on October 17, 2019, the

7

magistrate judge issued a Report and Recommendation recommending that this Court grant Defendant's Motion for Judgment of Possession [Doc. 40].

The magistrate judge found that "Plaintiff committed a material breach when it failed to pay taxes on the Property." [*Id*. at p. 21]. With respect to the improvements of the clubhouse, the magistrate judge found that "both parties did not comply with their obligations under the Lease Agreement," but the parties' breaches were not material for purposes of the Motion for Judgment of Possession [*Id*. at p. 22]. For example, the Initial Work was not completed by the requisite deadline but the remedy for such breach was abatement of certain rent [*Id*.]. Regarding the Third Phase Interior Improvements and Exterior Improvements, the magistrate judge found that Plaintiff did not select the materials for the projects that gave it the exclusive right to do so and Defendant did not complete the remaining projects that did not require Plaintiff's selection of materials [*Id*.]. Again, the magistrate judge found that the remedy for any incomplete improvements was abatement of certain rent [*Id*.]. As for the Main Level Renovations, the magistrate judge found that Plaintiff did not provide the designs and cost estimates, which were required for such renovations [*Id*. at p. 23]. Regarding Plaintiff's failure to pay rent, the magistrate judge found that some, but not all, rent abated as a result of the improvements not being completed by the requisite deadlines [*Id*.].

Following a review of the record, this Court adopted and approved the Report and Recommendation and granted Defendant's Motion for Judgment of Possession [Doc. 51]. Prior to the issuance of the Report and Recommendation, Plaintiff filed the Motion for Partial Summary Judgment that is currently before the Court, in which Plaintiffs asserts that there are no genuine issues of material fact as to Defendant's breach of the contract, intentional misrepresentation, and breach of the covenant of quiet enjoyment [Doc. 34].

8

## II. LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The moving party bears the initial burden of demonstrating that no genuine issue of material facts exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "come forward with significant probative evidence showing that a genuine issue exists for trial." *McKinley v. Bowlen*, 8 F. App'x 488, 491 (6th Cir. 2001). The nonmoving party "may not rest upon mere allegations or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the nonmoving party based on the record. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986).

## III. ANALYSIS

### A. Breach of Contract[1]

---

[1] A federal court with diversity jurisdiction must apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). Under Tennessee law, choice-of-law provisions in contracts are generally honored, absent bad faith. *Goodwin Bros. Leasing v. H & B Inc.*, 597 S.W.2d 303, 308 (Tenn. 1980). Paragraph 42(c) of the Lease provides that it "shall be governed and construed in accordance with the laws of the jurisdiction in which the Leased Premises is located" [Doc. 1-1, p. 16]. The Country Club is in Sullivan County, Tennessee. Thus, Tennessee law applies to Plaintiff's claim.

9

Plaintiff asserts there is no genuine issue of material fact as to Defendant's failure to perform its obligations under the Lease [Doc. 35, p. 9]. Specifically, Defendant failed to complete the Third Phase Interior Improvements and the Exterior Improvements [Doc. 35, p. 9–10]. In response, Defendant argues that Plaintiff breached the Lease and prevented performance of Defendant's obligations by failing to approve plans for such improvements, which were to be completed to Plaintiff's "reasonable satisfaction" [Doc. 41, p. 13]. Furthermore, Defendant argues that once Plaintiff provided plans, Defendant was willing to start the work, but Plaintiff refused to pay rent and property taxes [Doc. 41, p. 13]. Plaintiff takes the position that it was not required to provide plans for the work, rent was abated due to the delay in obtaining the required licensing and Defendant's failure to complete its work by the requisite deadlines [Doc. 46, p. 3–5]. Additionally, Plaintiff asserts that property taxes were submitted for payment after the June and July unmet deadlines and after Plaintiff's December 2018 written Notice of Default [Doc. 46, p. 5]. To adequately address the parties' positions, the Court must first interpret the relevant provisions of the Lease.

The interpretation of a contract is a legal issue for the Court. *First Am. Nat'l Bank v. Fidelity & Deposit Co. of Md.*, 5 F.3d 982, 984 (6th Cir.1993). When interpreting a contract, courts should "ascertain and give effect to the intention of the parties." *White v. Empire Exp., Inc.*, 395 S.W.3d 696, 714 (Tenn. Ct. App. 2012) (citing *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005)). First, courts look to the language of the contract to determine whether it is ambiguous. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002). If the language is unambiguous, "the literal meaning of the language controls the outcome" of the dispute. *Id.* If the language is ambiguous, meaning the terms are "susceptible to more than one reasonable interpretation," courts construe the ambiguity against the drafter of the contract. *White*,

10

395 S.W.3d at 714. The provisions of a contract "should be construed as in harmony with each other, if such construction can be reasonably made, so as to avoid repugnancy between the several provisions of a single contract." *Rainey v. Stansell*, 836 S.W.2d 117, 119 (Tenn. Ct. App. 1992).

Here, the relevant provisions of the Lease are the "reasonable satisfaction" requirement for Defendant's work and the provisions providing for abatement of rent. First, the Report and Recommendation adopted by this Court expressly rejected Defendant's interpretation that "reasonable satisfaction" required Plaintiff to provide scope of work on all phases of the project [Doc. 40, p. 23]. The magistrate judge noted that Defendant was attempting to interpret the reasonable satisfaction requirement as a condition precedent for Defendant's performance of the work [Doc. 40, p. 23]. As the magistrate judge noted, this interpretation is in direct conflict with the language of the Lease. Regarding the Third Phase Interior Improvements, which all had to be completed to Plaintiff's reasonable satisfaction, Plaintiff only had the "exclusive right to select the material" for four of the projects that were a part of this phase [Doc. 1-1, p. 4 & 40]. Furthermore, the Main Level Renovation specifically required Plaintiff to "submit architectural, engineering, and design plans and a cost estimate" [Doc. 1-1, p. 5]. For this Court to construe the provisions in harmony and avoid repugnancy, "reasonable satisfaction" cannot be interpreted as requiring Plaintiff to provide scope of work. Therefore, the Lease did not obligate Plaintiff to provide scope of work for all the Third Phase Interior Improvements or any of the Exterior Improvements.

Regarding abatement of rent, the remedy for Defendant's failure to complete the Third Phase Interior and Exterior Improvements is provided for in paragraphs 7(c) and (d) of the Lease:

> (c) …If Landlord fails to complete the Third Phase Interior Improvements on or before [June 30, 2018], then all Rent shall abate until the Third Phase Interior Improvements are complete.

11

> (d) …If Landlord fails to complete the Exterior Improvements on or before [July 30, 2018], then all Rent shall abate until the Exterior Improvements are completed.

[Doc. 1-1, p. 5]. "Rent" is also clearly defined in the Lease as "Monthly Fixed Rent and Monthly Percentage Rent" [Doc. 1-1, p. 3]. Therefore, if Defendant failed to complete the Third Phase Interior Improvements, Monthly Fixed Rent and Monthly Percentage Rent would abate from June 30, 2018 to the date of completion. Likewise, if Defendant failed to complete the Exterior Improvements, Monthly Fixed Rent and Monthly Percentage Rent would abate from July 30, 2018 to the date of completion. Another abatement provision in the Lease is found in paragraph 5(f), which provides:

> The Rent Commencement Date and Tenant's obligation to pay Monthly Percentage Rent shall not commence and shall be extended daily until such time as…Tenant, with the cooperation of Landlord, receives…all licenses necessary to operate the Leased Premises pursuant to the Lease, including…the liquor license…"

[Doc. 1-1, p. 4]. "Rent Commencement Date" is referenced in relation to Monthly Fixed Rent in paragraph 5(a) of the Lease [Doc. 1-1, p. 3]. Based on the plain language, this provision unambiguously provides for an additional abatement of Monthly Fixed Rent and Monthly Percentage Rent until such time as Plaintiff received a liquor license.

Applying these provisions of the Lease, the Court will now assess Plaintiff's contention that there remain no genuine issues of material fact as to Defendant's breach of contract. Plaintiff asserts that Defendant breached the Lease by failing to complete the Third Phase Interior Improvements and Exterior Improvements. Defendant asserts that those phases of work were not met due to Plaintiff's failure to fulfill its obligations under the Lease. Essentially, Defendant is asserting the first-to-breach rule. Under this rule, "[a] party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract." *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990).

12

As the magistrate judge found, both parties failed to fully perform under the Lease. First, F&B Rent commenced on April 1, 2018, and was not subject to abatement pursuant to the Lease. It is undisputed that Plaintiff has not made any payments toward F&B Rent. Second, Landlord's Initial Work was required to be completed on April 1, 2018, and it is undisputed that Defendant did not complete such work by the deadline. However, the remedy for this breach is provided for in the Lease as abatement of Monthly Fixed Rent and Monthly Percentage Rent. Third, Defendant did not complete the Second Phase Interior Improvements by the April 30, 2018 deadline and there was no abatement provision relating to this phase of work. Fourth, it is undisputed that Defendant never completed the Third Phase Interior or Exterior Improvements. Again, the remedy for this failure was provided for in the Lease—abatement of Monthly Fixed Rent and Monthly Percentage Rent. Finally, this Court has already found that Plaintiff failed to pay property taxes when they became due in January 2019 and February 2019.

Although the facts illustrate that both parties breached the Lease, the question of whether a breach is material is generally a question of fact. *Hodak v. Madison Capital Mgmt., LLC*, 348 F. App'x 83, 90 (6th Cir. 2009). A breach is material if it is "so fundamental to [the] contract" that it "defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract." *CMACO Auto. Sys., Inc. v. Wanxiang Am. Corp.*, 589 F.3d 235, 248 (6th Cir. 2009). It would be improper for the Court to decide which party committed the first material breach at this state in the litigation. Thus, genuine issues of fact remain, and summary judgment on Plaintiff's breach of contract claim is inappropriate.

### B. Intentional Misrepresentation

Plaintiff asserts that Defendant intentionally misrepresented (1) the Club was in operating condition to be immediately opened for business and (2) there was no mold in the clubhouse as of

13

the commencement date [Doc. 34, p. 12]. Defendant asserts the Club was operational and generating revenues from the commencement date of the Lease and it had no knowledge of the presence of mold [Doc. 41, p. 22].

A claim for intentional misrepresentation requires a plaintiff to show the following elements:

> (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damage as a result of the misrepresentation.

*Walker v. Sunrise Pontiac–GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008).

Regarding the condition of the Club, Defendant represented and warranted in the Lease that it would deliver the Club to Plaintiff "in an operating condition (not including further work to be completed as provided for under [the] Lease) to be immediately opened for business [Doc. 1-1, p. 2]. This was a representation of the existing fact that the Club was operational. However, it is disputed whether this was a false representation. Plaintiff asserts that it was "forced to operate out of the neighboring property" and Defendant asserts that "the clubhouse was operational and generating revenues from day one." Even if the representation was false, Defendant asserts that Plaintiff visited the Club several times before executing the Lease and was well-aware of the condition of the property through its own inspection. Therefore, it is disputed whether Plaintiff was reasonable in relying on Defendant's representation when it had first-hand knowledge of the condition and operational status of the Club.

Regarding the presence of mold in the clubhouse, Defendant made the representation that there was no existing mold in the clubhouse when there was, in fact, mold in the clubhouse. However, Defendant has put forth substantial probative evidence showing that it had no knowledge

14

of the presence of mold at the time it made the representation. Defendant performed a mold assessment on April 2, 2018, [Doc. 18-5] and "[a]ll was satisfactory per report" [Doc. 41, p. 22].

Viewing the facts contained in the record in the light most favorable to Defendant, there are genuine issues of material fact as to whether Plaintiff was reasonable in relying on Defendant's representation of the condition of the Country Club and whether Defendant knew of the presence of mold in the clubhouse. Thus, summary judgment on Plaintiff's intentional representation claim is not warranted.

### C.     Breach of the Covenant of Quiet Enjoyment

Plaintiff asserts that Defendant breached the covenant of quiet enjoyment by "demolish[ing]" the main level of the clubhouse, leaving it completely unusable for any purpose [Doc. 34, p. 14]. Defendant covenanted in the Lease that Plaintiff would "peaceably and quietly have, hold and enjoy the demised Premises" [Doc. 1-1, p. 4]. As the name suggests, the "covenant of quiet enjoyment protects the lessee from any act of the lessor which destroys the quiet and beneficial enjoyment of the use of the property." *Couch v. Hall*, 412 S.W.2d 635, 637 (Tenn. 1967). This covenant is breached if the "landlord obstructs, interferes with, or takes away from the tenant in a substantial degree the beneficial use of the leasehold." *Hixson v. Am. Towers, LLC*, 593 S.W.3d 699, 713 (Tenn. Ct. App. 2019).

Plaintiff contends that it "entered into the Lease expecting the use and enjoyment of…both levels of the clubhouse" [Doc. 34, p. 14]. As Defendant points out, this is patently unreasonable based on the plain language of the Lease. Pursuant to paragraph 7(e) of the Lease, the Main Level Renovations would not be complete until sometime after February 2019—almost a year after the commencement date [Doc. 1-1, p. 5]. Plaintiff has not met its initial burden of demonstrating that

15

no genuine issue of material facts exists. Therefore, summary judgment on Plaintiff's claim of the breach of the covenant of quiet enjoyment is inappropriate.

## IV. CONCLUSION

Accordingly, for the reasons stated herein, Plaintiff's Motion for Partial Summary Judgment [Doc. 34] is **DENIED**.

SO ORDERED:

s/ Clifton L. Corker
United States District Judge

16

Case 2:19-cv-00084-DCLC-CRW   Document 56   Filed 06/26/20   Page 16 of 16   PageID #: 1676